[No. 4545.]

JORDAN ET AL. v. GREIG.

1. **Pleading—Amendment.**

Where, after hearing the evidence in a case, the court, upon motion of plaintiff, reopened the case for the hearing of further testimony and continued it till the next term, and the court further ordered that the plaintiff be allowed to file an amended complaint, based upon the evidence heard, it was not error to allow such amendment without a motion and affidavit showing good cause therefor.

2. **Pleading—Amendment—Discretion.**

The allowance of an amendment to a pleading is within the sound discretion of the trial court, and where the adverse party is not prejudiced by such amendment and is given ample opportunity to meet its allegations, the allowance of such amendment is not ground for a reversal.

3. **Pleading—Amendment—Variance—New Cause of Action.**

Where, in a suit to cancel a lease of mining property, the complaint alleged that the lessor had executed a prior lease to plaintiff's grantor, that the property stood in the name of W. C. J., and that he had executed the lease to plaintiff's grantor in the name of C. J., and upon trial it appeared from the evidence that W. C. J. and C. J. were two different persons, and that C. J. was the father of W. C. J., an amended complaint which alleged that the property stood in the name W. C. J., who held it in trust for C. J., and that C. J. executed the lease to plaintiff's grantor with the knowledge and consent and by the direction of W. C. J., and that W. C. J. unlawfully conspired with

and executed to defendant lessee the lease sought to be avoided for the purpose of defrauding plaintiff of his rights under the lease executed by C. J., was not such a variance from the original complaint as would constitute a new cause of action.

**4. Pleading—Amendment—Parties.**

The bringing into an action of a new and additional party defendant by an amended complaint, is not reversible error where the new defendant made no objection, and the original defendants failed to show that they were in any way injured or prejudiced thereby.

**5. Evidence—Principal and Agent.**

In an action to cancel a lease to mining property on the ground that the father of the lessor, with the knowledge and consent and by the direction of the lessor, had executed a prior lease to plaintiff's grantor, a correspondence wherein plaintiff's assignor had addressed letters to the said lessor in relation to the property in controversy which were replied to by his father, was admissible in evidence to show the relation of the father to the property and to what extent he represented lessor in its management and control.

**6. Appellate Practice—Finding of Trial Court—Evidence.**

Unless it is manifest that the evidence is wholly insufficient to support the finding of the trial court thereon, such finding is conc'usive on the appellate court, and this rule applies not only to the credibility of witnesses and weight of evidence, but also to the inferences that the trial court properly deduces from the facts and circumstances proved.

**7. Principal and Agent—Evidence—Mining Lease.**

In an action to cancel a lease to mining property on the ground that lessor's father had, with the knowledge and consent and by the direction of the said lessor, executed to plaintiff's grantor a prior lease to the same property, evidence that the property was assessed for taxes in the father's name, and that the taxes were paid by plaintiff's grantor and receipts taken in the father's name; that all letters written by plaintiff's grantor and directed to lessor were answered by the father; that at all times since the lessor became vested with the title to the property, his father had apparently assumed entire control and management of matters connected therewith; and that the lessor gave no attention to the property, was sufficient to justify a finding that the father was interested in the property, or that the son had permitted the father to exercise such control of the property as would estop him from repudiating his father's act in giving the lease to plaintiff's grantor.

*Appeal from the District Court of San Miguel
County:*
*Hon. Theron Stevens, Judge.*

The merits of this controversy can be better
understood from a statement of the circumstances
which led up to the institution of the suit and which,
in substance, are as follows:

From 1881 to 1885 The Evans Mining and Mill-
ing Company owned the Nevada lode mining claim,
situated in San Miguel county, Colorado, being the
property mentioned in the complaint.

Charles Jordan and Winfield C. Jordan are
father and son, and have resided during all the times
mentioned at Wakefield, Massachusetts.

On February 5, 1884, Charles Jordan, as presi-
dent of this company, executed in its name a trust
deed conveying the Nevada lode to George K. Ham-
blin, as trustee, to secure the payment of the sum of
ten thousand dollars alleged to have been loaned to
the company by his son, Winfield C. Jordan, who was
then 22 years of age.

October 6, 1886, George K. Hamblin, in his
capacity as trustee, executed a power of attorney to
Milton Evans authorizing Evans to foreclose the
trust deed in Hamblin's name and as Hamblin's
attorney in fact.

On February 28, 1887, in pursuance of a fore-
closure of said trust deed, Evans, as such attorney in
fact, executed a deed purporting to convey the Nevada
lode to Winfield C. Jordan, and by virtue of said
deed Winfield C. Jordan appears and claims to be
the owner of the record title of said property. Under
date of January 30, 1897, a lease and option to pur-
chase the Nevada lode mining claim was executed to
S. R. Fitzgarrald and W. W. Cramer in the name of
W. C. Jordan. This lease and option required the

lessees to do a specified amount of work and pay all taxes assessed against the property during the life of the lease, including the unpaid taxes assessed for the year 1896.

December 8, 1897, the father wrote to Fitzgarrald as follows:

"Dear Sir:   *   *   *   How are you getting along with the Nevada?   When I was president of the mine the first year it cleared $10,000.   After that the money was gobbled up by our foreman and rascals here to help him.   I hope that silver will increase in value, so that something can be made in money.

"Yours respect.,

"CHAS. JORDAN."

In reply Fitzgarrald wrote to the son as follows:

"Feby. 1st, 1898.

"Winfield C. Jordan, Esq., Wakefield, Mass.

"Dear Sir:   At the request of Mr. Milton Evans I have looked into the matter of the sale and records of the Nevada lode mining claim, made to you upon foreclosure several years ago."   (Follows the opinion on that proposition.)   "I hope that you will not claim a forfeiture in the event that the work is not completed during the year.   I saw Mr. Evans about it and he said it would be all right if we paid the taxes, which are now due and payable for this year.   However, I wish you would write me a letter to the effect that you will not claim a forfeiture on account of failure to perform the first year's work required by the option.   *   *   *

"Yours truly,

"S. R. FITZGARRALD."

On February 8, Mr. Fitzgarrald received the following letter from the father:

"Wakefield, Mass., Feby. 8th, 1898.

"S. R. Fitzgarrald, Esq.

"Dear Sir:   I have received a notice that the tax

bill on the Nevada mine has not been paid. I believe the agreement was that you was to pay the taxes on same.                              "Yours,

"CHAS. JORDAN.

"P. S.—Please remit tax bill paid."

Fitzgarrald, in reply to this letter from the father, wrote the following letter to the son:

"Telluride, Colo., March 10, 1898.
"Winfield C. Jordan, Esq., Wakefield, Mass.

"Dear Sir: I received the notice of taxes on the Nevada mine, upon which we hold the lease. Some two weeks ago I wrote you, stating that I would like to have you answer my letter waiving any forfeiture on the lease by reason of a failure to perform as much work as was required of us the first year, ending May 1, 1898, but have not heard from you. We have not done any more work since the date of my letter, and will probably not before May 1, as it seems to be a pretty hard matter to get anyone to take hold of the property in its present condition. Our contract provides for paying the taxes and we paid them for one year, and the taxes for 1897 are not due and payable until the early part of 1898, at the time you received the notice.

"Upon receipt of your letter, stating that you will waive the forfeiture, I will pay the taxes, as stated in the notice. I now have a party who thinks he will go to work on the property in the early spring, but would like to hear from you relative to this matter of forfeiture before going to any more expense in paying taxes or otherwise.

"Yours truly,
"S. R. FITZGARRALD."

This letter was returned to Fitzgarrald with the following endorsement on the margin:

"Forfeiture hereby waived.
"WINFIELD C. JORDAN."

Thereupon Fitzgarrald paid the taxes and wrote the following letter:

"Telluride, Colo., Mch. 23, 1898.

"Winfield C. Jordan, Esq., Wakefield, Mass.

"Dear Sir: Yours waiving forfeiture of the work required on bond and lease on the Nevada mine, received. Many thanks for the same. Enclosed find tax receipt for taxes paid on Nevada mine by us this day.          "Yours truly,

"S. R. FITZGARRALD."

On September 26, Fitzgarrald telegraphed to W. C. Jordan as follows:

"W. C. Jordan, Wakefield, Mass.

"Wire me authority to obtain ore shipments from Nevada mine to any sampler or smelter.

"S. R. FITZGARRALD."

And received in reply, "Don't understand your telegram." The next day the father wrote Milton Evans as follows:

"Dear Sir: * * * How is Fitzgarrald getting along? * * * Fitzgarrald telegraphed to son about shipping ore, which we could not understand.

"Yours respect.,

"CHAS. JORDAN."

On September 27, 1898, Fitzgarrald wrote to the son stating the reason why he desired his authority to obtain smelter returns of ore theretofore shipped from the mine, and asked him to make a statement in writing to this effect: "I, .............., owner of the Nevada mine, at Ophir, Colorado, hereby authorize any smelter or sampling works who have purchased ore or treated ore from its mine, to give to S. R. Fitzgarrald a statement of the amount of ore and its value. * * * Trusting that I have been explicit in this matter and that I will hear from you at once,

"Yours truly,

"S. R. FITZGARRALD."

In reply to this letter, written to the son, Fitzgarrald received the following letter from the father:

"Wakefield, Mass., Oct. 3rd, 1898.

"S. R. Fitzgarrald, Esq.

"Dear Sir: I think that Milton Evans can tell you all about the ore smelting business in Colorado. I will try and find Hamblin, who ran the mine two years and stole the whole, and let you know as soon as possible; in the meantime my son will write you.

"Yours,

"CHAS. JORDAN."

Mr. Fitzgarrald received no letter from the son, but the father wrote again, on October 4, as follows:

"S. R. Fitzgarrald, Esq.

"Dear Sir: When I was president of that company, some years ago, the mine cleared $5,000 in one year, under Fulsom's management. He is now in North Carolina somewhere and I cannot reach him. Milton Evans had charge of the mine a short time and cleared $1,500 in one month, when the new manager was sick. The last manager, Geo. K. Hamblin, who is in Flushing, L., will give you some information about the matter. I think I will write him at once and tell him what I want, and see if he will communicate with you or through me. He and his brother-in-law gobbled up all the funds of the company by building big winter sheds, to work in winter, and otherwise.

"Yours respect.,

"CHAS. JORDAN."

The following letter was received from Hamblin:

"New York, Oct. 25, 1898.

"S. R. Fitzgarrald, Esq.

"Dear Sir: At the request of Charles Jordan, of Wakefield, Mass., I herewith send you some data relative to the value of ore taken from the Nevada mine,

in Ophir, from '83 to '86, inclusive, and hope it will serve your purpose.

"Yours truly,

"GEO. K. HAMBLIN."

At the trial Fitzgarrald testified that prior to 1899 he had uniformly addressed all of his letters to *Winfield* C. Jordan; that the Nevada mining claim was assessed in the name, and as the property, of *Charles* Jordan; that requests to pay the taxes were sent to him each year from Wakefield, Mass., by *Charles* Jordan; and that he paid the taxes in the name of, and for, Charles Jordan, in whose name receipts were issued; that all letters written to him about the Nevada mining claim, as well as all the answers to his letters had, with one exception, been signed in the name of Charles Jordan; and that he, Fitzgarrald, had thereby obtained the impression that Winfield C. and Charles Jordan were one and the same person.

Winfield C. Jordan, the son, neglected to pay any attention to Mr. Fitzgarrald's request, but the father continued to do so, and later wrote the following letter:

"Wakefield, Mass., Dec. 28, 1898.

"S. R. Fitzgarrald, Esq.

"Dear Sir: How are you getting along with the mining business? Did you get the information from Hamblin that you wanted?   *   *   *

"Yours respect.,

"CHAS. JORDAN."

In reply, Fitzgarrald, for the first time, addressed his letters to *Charles* Jordan, and wrote as follows:

"Telluride, Colo., Jany. 10th, 1899.

"Chas. Jordan, Esq., Wakefield, Mass.

"Dear Sir:   *   *   *   I received the data from Hamblin relative to the Nevada mine. We were una-

ble to make the deal we were working on this fall, but the parties are still negotiating and in the spring we may make some kind of an arrangement whereby a cross-cut tunnel will be run to cut the Nevada lead. This, of course, will require a change in our present contract, particularly as to time, as it will take a long time to run a cross-cut 1,200 or 1,300 feet long. The work we have done on the property has been in the old workings, simply examining the same, and this, with considerable difficulty, as the timbers are destroyed. We desire to see if there was anything of value above the old tunnel level, and we have determined that there is nothing to justify any work, unless it is running a cross-cut to cut an ore body that has been worked out above the tunnel level, and in all probability extends downwards. * * *''

In March, 1899, Charles Jordan sent the usual tax notice and requested Fitzgarrald to pay the taxes on the Nevada mine, to which Fitzgarrald replied as follows:

"March 21, 1899.

"Chas. J. Jordan, Esq., Wakefield, Mass.

"Dear Sir: I received the tax notice on the Nevada mine from you and have paid the taxes, and will enclose you the tax receipt in order that you may see that they have been paid. * * * There is a party has a tunnel in several hundred feet that, if extended, would cut the Nevada some six hundred feet below the old workings, and we are getting up a combination to go to work on this tunnel the coming season. It looks very favorable for it to go through. If we can do this, we will want to have you make some change in our present bond and lease to fit the new situation, as it will take a long time to run the tunnel in to the vein and make the upraise and prove whether the ore body that was in the old workings runs down in the vein. As soon as we get the matters

arranged so as to tell just what changes we will have to have made, we will communicate with you relative to the matter. If we make this deal go, we will prove up the mine or show that it is worthless.

"Yours truly,

"S. R. FITZGARRALD."

On April 18, 1899, Fitzgarrald mailed to Charles Jordan the new lease and option upon which plaintiff bases his right to the relief sought in this action, and wrote him as follows:

"Charles Jordan, Esq., Wakefield, Mass.

"Dear Sir: As written you some time ago, we have been trying to get to work on the cross-cut tunnel to cut the Nevada mine at some depth below the old workings. The chances are very favorable now that we will be able to work the vein, provided we can get a change in our present contract to conform to the new conditions. * * * We have drawn up a new contract to take the place of the old one, and send the same to you for your approval and signature. * * * I have made them in duplicate, so you may retain one copy and return the other to me.

"Yours truly,

"S. R. FITZGARRALD."

To this he received the following reply:

"Wakefield, Mass., April 27th, 1899.

"S. R. Fitzgarrald, Esq.

"Dear Sir: Please send me a copy of your lease, as I cannot find the old one to return. If I find it I will return it.

"Yours respect.,

"CHAS. JORDAN."

On May 10, 1899, Fitzgarrald wrote as follows:

"Chas. Jordan, Esq., Wakefield, Mass.

"Dear Sir: I have just returned from the East and have yours of the 27th of April, requesting me to send you copy of your old contract, and in reply

would say that the parties that I have been figuring with I let take the contract and they have mislaid it. One of them is out of town. I do not know when I will be able to get it. However, the new contract I sent you to sign, when executed, takes the place of the old one, and it is not material as to its being canceled or returned.

"Yours truly,

"S. R. FITZGARRALD."

Thereupon this lease and option was signed and acknowledged in the name of Charles Jordan on May 16, 1899. On June 26, 1899, Fitzgarrald and Cramer assigned this lease and option to the appellee, plaintiff below, and on July 3, 1899, Charles Jordan gave his consent thereto in writing, as follows:

"I, Charles Jordan, of Wakefield, Mass., *owner of the Nevada lode mining claim,* in San Miguel county, Colorado, do hereby consent that S. R. Fitzgarrald and W. W. Cramer, of San Miguel county, Colorado, may transfer and assign the bond and lease held by them on the said Nevada mine, dated April 18th, 1899, to Alexander Greig, of Ophir, Colorado, it being understood that the said Greig is to assume and carry out all the conditions of said instrument, the same as the said Fitzgarrald and Cramer had obligated themselves to do.

"Dated this 3d day of July, 1899.

"CHAS. JORDAN.

"Witness: Geo. A. Cowdrey."

By virtue of this assignment the appellee took possession of the Nevada lode mining claim and commenced work thereon under this new bond and lease, and continuously remained in possession thereof, driving a cross-cut tunnel, more than was required by the conditions of his lease, and prior to May 1, 1900, expended between $3,000 and $4,000.

In January, 1900, the following letter was sent to Charles Jordan:

"Office of County Treasurer of San Miguel County, Colorado.

"Telluride, Colo., January 20th, 1900.
"To Chas. J. Jordan.

"The tax list of San Miguel county for 1899 is now in my hands for collection. The total valuation assessed and taxes charged against you on the list are as follows: Total valuation, $200.00; tax on real estate, $10.06; tax on personal property,......; total tax, $10.06.

"One-half of total tax is delinquent after February 28th, 1900, after which date interest will be charged according to law.

"E. M. ARTHUR,
"Treasurer and Tax Collector."

Charles Jordan enclosed this notice in a letter to Fitzgarrald, which ran as follows:

"Wakefield, Mass., Feb. 5, 1900.
"S. R. Fitzgarrald, Esq.

"Dear Sir: Within you will find tax bill for the Nevada mine, which you leased.

"I wish to inquire how much you have worked out on the property since you took the lease? Please return the tax receipt when paid.

"Yours respect.,
"CHAS. JORDAN."

This tax notice was forwarded to Mr. Greig, who paid the taxes, sent the receipt therefor to Charles Jordan, and wrote him fully what work he was doing in the Nevada lode. About that time The Milwaukee-Ophir Mining Company commenced negotiations for a lease and option on the Nevada lode, and under date of April 25, 1900, a lease and option to purchase the Nevada lode was executed in the name of W. C. Jordan to the defendant mining company. George

R. Dolf, agent and manager of the company, con-
ducted the negotiations. This lease and option was
sent to the Bank of Telluride to be delivered upon
payment of the sum of $500, ten per cent. of which
sum was to be paid to the witness Milton Evans,
agent of the defendant.

On December 10, 1900, Mr. Greig brought this
action, and, understanding that W. C. Jordan and
Charles Jordan were one and the same person, made
Winfield C. Jordan and The Milwaukee-Ophir Min-
ing Company parties defendant. The action was
brought for the purpose of having his lease and
option declared prior in time to the lease and option
given The Milwaukee-Ophir Mining Company, and
to have his title quieted. In his complaint he alleged
that the record title to the Nevada lode stood in the
name of Winfield C. Jordan, and that Winfield C.
Jordan executed the lease and option to Fitzgarrald
and Cramer, and consented to the assignment thereof
in the name of Charles Jordan. The cause came
on for trial on June 7, 1901, when it was disclosed
by the testimony of Mr. Evans that there were two
Jordans, Charles Jordan and Winfield C. Jordan,
father and son; that he had written to W. C. Jordan
for an explanation as to why two leases had been
executed, and had received a reply; that this letter
and the letters received by him in the course of his
long correspondence with the Jordans were at his
home in Placerville, and could be produced by him;
that he supposed Charles Jordan had an interest in
the Nevada lode, but did not know.

Upon the conclusion of the testimony the judge
trying the case stated that the evidence was not as
full and complete as he wished it might have been,
and that he would take the matter under advisement.
Later, at the same term of court, plaintiff filed a
motion to reopen the case and allow further evidence

to be given. The motion was sustained and the cause continued until the next term.

The court further ordered that "the plaintiff may reform his pleadings, and such amended complaint be filed within 20 days, and that defendants, if so advised, may answer same within 10 days after receipt of copy thereof." On October 2, 1901, plaintiff filed an amended complaint and made Charles Jordan a party defendant. In the amended complaint, it was alleged, *inter alia,* that the record title of the Nevada claim was in the name of W. C. Jordan, but upon information and belief charged that the lease and option to Fitzgarrald and Cramer, and the consent of the assignment thereof to the plaintiff, were executed and delivered with the knowledge and consent, and by the direction, of Winfield C. Jordan. That this defendant unlawfully and fraudulently conspired with The Milwaukee-Ophir Mining Company to defraud plaintiff of his rights under the lease and option executed by Charles Jordan, and that he fraudulently executed the subsequent lease and option to The Milwaukee-Ophir Mining Company. Winfield C. Jordan and the Milwaukee-Ophir presented a motion to strike this amended complaint from the files for the reason, among others, that it stated a new and different cause of action because of a variance between its allegations and those of the original complaint. This motion was overruled, and thereupon the company and W. C. Jordan filed a joint answer denying that W. C. Jordan had knowledge of, or consented to, the execution of the lease and option by his father, and the allegations of fraud and conspiracy, and by cross-complaint set out their lease and option. On November 8, 1901, Charles Jordan filed his answer, denying that he executed the lease and option signed by him with the knowledge or consent of his son, and averred that, by reason of his age, he was

indisposed to business transactions; that he relied on the sagacity of Fitzgarrald, who drew the lease and option; and that he signed the same without reading or understanding the scope and meaning thereof. To this answer replications were filed, and the trial of the cause was again resumed at the May term, 1902.

On this trial, in addition to the testimony already submitted, the witness Evans was recalled, and certain letters signed by Charles Jordan, among which were the following, were received and read in evidence:

"Wakefield, Mass., Nov. 20, 1895.
"Milton Evans, Esq.

"Dear Sir: I wish for you to find out if you could be endowed with power from George Hamblin, who, according to the laws of Colorado, had a power to sell the mine. I think he could not give you a power to sell. If he could not, then the sale was illegal, and the court could appoint you or any one which you could suggest, and have the property sold over again. I wish you could find out if you had the right to sell the mine. I shall pay you for your trouble to do so. You probably recollect how he gave it in a power of attorney.

"Yours respectfully,
"Chas. Jordan."

"Wakefield, Mass., Jan'y 25, 1896.
"Milton Evans, Esq.

"Dear Sir: * * * I am going to look up the papers on the Nevada mine and see what we can do. I do not think that Hamblin could give you a power of attorney, for the papers speak of someone else to take charge if he fail to do it. I think it well to lease the mine. I would like to get a company formed and pay in so much and would take stock, etc., for my part, say stock for $20,000. I would take one-half of the stock or $10,000, * * * If there is any way

to cut Gentry's throat, I want it done. I paid taxes 1891 and 1892, $13.22 and $16.28, and sent him $20.00 in 1890, which should pay my taxes on the lot for 10 years.                     "Yours,
                              "CHAS. JORDAN."
                    "Wakefield, Mass., May 17, '96.
"Milton Evans, Esq.

    "Dear Sir: How are you getting along out in Colorado? * * * I should like to get rid of the Nevada some way. I do not see but you will have to look after it and be paid for your trouble. Let me know how things look in general out there.
                              "Yours,
                              "CHAS. JORDAN."
                    "Wakefield, Mass., Sept. 6, '96.
"Milton Evans, Esq.

    "Dear Sir: * * * I wish you would give me the parties' names who hired the Nevada mine. I should like to know where they are smelting the ore. I wish you would keep an eye on them for me and you will get well paid for it if I am able to dispose of it. * * * Hope to hear from you soon about the mine business, and I am going to look up the sale of the Nevada mine to see if it was legal. If not, I shall advertise and sell again on account of my son's mortgage.                     "Yours,
                              "CHAS. JORDAN."
                    "Wakefield, Mass., Dec. 31, '96.
"Milton Evans, Esq.

    "Dear Sir: I wish you would find out if the parties have paid taxes on the Nevada mine. I have written to the tax collector, but have got no answer. Please give me the man's name and where his address is.                     "Yours,
                              "CHAS. JORDAN."

"Wakefield, Mass., Sept. 27, 1898.
"Milton Evans, Esq.
"Dear Sir: Your letter and offer received. You can go ahead to suit yourself on the offer made. How is Fitzgarrald getting along? * * * Fitzgarrald telegraphed to son about shipping ore which we could not understand.

"Yours respectfully, .
"Chas. Jordan."

Mr. Evans testified that he had received letters written by Winfield C. Jordan on the subject of the lease given by Charles Jordan, but he failed to produce any of them at the time of the trial, although served with a subpœna requiring him to bring them into court.

The depositions of Winfield C. Jordan and Charles Jordan were taken and read upon this trial. W. C. Jordan testifies that he originally loaned The Evans Mining and Milling Company $10,000, and claims title to the Nevada lode under the foreclosure of the trust deed given to secure the payment of the money loaned by him to the company, and that he did not allow his father to transact business for him in 1899, or at any time before or after that date; that his father, Charles Jordan, could not have answered any letters addressed to him by Fitzgarrald; that he never permitted him to answer any such letters.

Charles Jordan testifies that he had some correspondence with Fitzgarrald in relation to a mining property, but was unable to recognize it by name; denies that he wrote to Fitzgarrald in reply to any letters which Fitzgarrald had addressed to his son W. C. Jordan. He further testifies that he did not know whether or not Winfield C. Jordan, during the year 1899, or prior thereto, received any letters from Fitzgarrald in relation to the Nevada lode mining claim. He denies that he replied to any such letters

received by Winfield C. Jordan from Fitzgarrald. He also denies that W. C. Jordan, his son, held any interest for him in the Nevada lode, and that his son had any knowledge of his intention to execute, or of his having executed, the lease and option to Fitzgarrald and Cramer.

It appears from the evidence that George R. Dolf, manager of The Milwaukee-Ophir Mining Company, went into and examined the cross-cut tunnel then being driven by Mr. Greig to cut the Nevada vein, in October, 1899, and also that he examined the record of Greig's option and lease, and had knowledge that Greig was in possession of the Nevada claim under it, before and at the time he paid the $500 into the bank and received the lease and option for the Milwaukee-Ophir company.

The court below found from the evidence and circumstances disclosed that Winfield C. Jordan had permitted his father, Charles Jordan, to hold himself out to such an extent as the owner, or as having control of the property as to estop him from repudiating the action of his father in the premises, to the prejudice of the appellee, who took the assignment of the lease and option without knowledge of any defects, and had expended a large sum of money in the development of the property thereunder; that the Milwaukee-Ophir company took its lease and option with full knowledge of appellee's rights, and rendered judgment in favor of plaintiff for the relief prayed for.

The company and the Jordans bring the case here on appeal.

Mr. L. C. KINIKIN, for appellants.

Messrs. STORY & STORY, for appellee.

Mr. JUSTICE GODDARD delivered the opinion of the court.

Numerous errors are assigned, but counsel for appellants confine their argument mainly to the following propositions:

First. That the court erred in reopening the case and permitting plaintiff to file an amended complaint, and in overruling the motion to strike same from the files because of insufficiency and alleged change of cause of action.

Second. The bringing in of Charles Jordan as an additional defendant.

Third. The admission of improper evidence.

Fourth. That the court erred in its findings of fact and conclusions of law, and in entering judgment against appellants.

1. In support of the alleged error in allowing the amended complaint to be filed, it is urged that the same was allowed without motion and affidavit showing good cause therefor. We think a sufficient answer to this is found in the fact that the order was made after the facts upon which the amendment was based were disclosed on the first hearing, and were within the knowledge of the court; therefore an affidavit seting up the same facts was unnecessary. In the circumstances, it is to be presumed that the court deemed the cause, or grounds, sufficiently apparent without a formal showing.—*Davis v. Johnson*, 4 Colo. App. 545.

When the order permitting the amendment was made, the case was reopened for the introduction of further evidence, and the cause continued for several months, affording appellants ample opportunity to meet its allegations, and we are unable to see wherein they, or either of them, were prejudiced in any manner by the allowance of the amendments. As said in *Davis v. Johnson, supra*, "The granting of leave to amend is within the sound discretion of the court, which should be exercised liberally in the interests of

justice, and unless, in consequence of its exercise, some disadvantage has resulted to the adverse party, the decision is no ground for a reversal.''

It is also insisted that there was such a variance in the allegations of the amended, from those in the original, complaint as to constitute a change in the cause of action.

In the original complaint it was alleged that the title to the Nevada claim stood in the name of Winfield C. Jordan, and that he, in the name of Charles Jordan, had executed the lease and option to Fitzgarrald and Cramer, and had consented to the assignment to Greig. Upon the first hearing, it being disclosed that there were two Jordans, father and son, it was alleged in the amended complaint that title to the property stood in the name of W. C. Jordan, who, as plaintiff is informed and believes, holds it in trust for Charles Jordan, and that Charles Jordan executed the lease and option and the assignment with the full knowledge and consent of W. C. Jordan.

The primary right of the plaintiff is the lease and option executed by Charles Jordan, and his right to the possession of the property thereunder. The delict or wrong is the execution by W. C. Jordan of the lease and option to the company, and the interference with plaintiff's possession by the company by virtue thereof.

The object of the action is to have the former adjudged valid, and the latter canceled. There is no difference in these particulars between the allegations of the respective complaints.

While the evidence to show the acquisition of plaintiff's title was different, in so far as it was to the effect that Charles Jordan, in executing the lease and bond, acted as the agent of W. C. Jordan, with his full knowledge and consent, instead of executing the instrument for him under the name of Charles

Jordan, there is no change in the statement of the ultimate facts upon which the plaintiff predicates his right to recover.

2.    The objection to the bringing in of Charles Jordan as a defendant, is without merit.  If the company and W. C. Jordan have the right to complain because of this, they fail to show that they were in any way injured or prejudiced thereby.  Charles Jordan made no objection in the court below, and he is not here complaining of any irregularities in the proceedings by which he was brought into the case.

3.    The testimony complained of is that of Fitzgarrald, and the letters written by him to W. C. Jordan, and the answers thereto by Charles Jordan, as set forth in the statement of facts.  This testimony was in relation to the subject-matter in controversy, and was admissible to show the relation of Charles Jordan to the property, and to what extent he represented W. C. Jordan in regard to its management and control.

4.    The principal and controlling question presented on this appeal is whether the findings of the court below, that W. C. Jordan is estopped from repudiating the action of his father in the premises and is bound by the lease and option executed by him to Fitzgarrald and Cramer, are supported by the facts and circumstances surrounding the transaction.

It is a familiar rule, too well settled to require the citation of authorities, that unless it is manifest that the evidence is wholly insufficient to support the findings of the trial court, such finding is conclusive upon this court.  And this rule not only binds us so far as it involves the credibility of witnesses and the weight of the evidence, but as well as to the inferences that the trial court properly deduces from the facts

and circumstances proved.—*Gwynn v. Butler*, 17 Colo. 114.

It appears from the record that the Nevada claim was assessed in the father's name, and in 1896 the father wrote Evans in regard to the taxes, and in each year from 1897 to 1900, inclusive; he also wrote Fitzgarrald in regard to them; that Fitzgarrald paid the taxes for each of these years at the request, and the receipts therefor were issued in the name, of the father, Charles Jordan; and that all letters written by Fitzgarrald and directed to W. C. Jordan were answered by the father, except the one dated March 10, 1898, upon the margin of which he wrote the words "Forfeiture waived." That at all times since W. C. Jordan became vested with the title, Charles Jordan has looked after the Nevada claim and apparently assumed the entire management and control of matters connected with it, and that during all this time, with the exception of signing the lease and bond given to Fitzgarrald and Cramer in 1887, W. C. Jordan gave no attention to the property.

In the face of this record we think the court was justified in questioning the credibility of the Jordans, and in finding that Charles Jordan was, to some extent, interested in, or that W. C. Jordan had permitted him to exercise such a control of, the property as should now estop him from repudiating his father's act in giving the lease and bond to Fitzgarrald and Cramer, and its assignment to appellee, who took the assignment of the instrument without knowledge that there was any question as to its validity, and has, in good faith, expended money in carrying out its terms; and in also finding that the mining company took its lease and bond with knowledge of, and is not now in a position to question, appellee's rights.

The judgment of the court below is manifestly

just, and we can perceive no reason why it should be disturbed.

It is, therefore, affirmed.        *Affirmed.*

Chief Justice Gabbert and Mr. Justice Bailey concur.