[No. 5668.]

## VIGIL v. GARCIA.

1.. Elections—Contest—Time Within Which to File.

The statute requiring that contests must be filed within 10 days after the date when the votes are canvassed, means all of the votes, otherwise the time for filing the contest would be uncertain; and where, for any reason, one or more election precincts are not canvassed at the time of the first sitting of the board of canvassers, the time does not begin to run until all such precincts are canvassed, although the returns from the uncanvassed precincts may not affect the result as between the candidates for any single office.—P. 433.

2. Same—Contests—Dismissal—Res Adjudicata.

Where an election contest is dismissed by contestant, over the objection of the contestee, after answer and replication are filed, such dismissal is not a bar to another contest depending on the same facts.—P. 434.

3. Appellate Practice—Elections—Contests—Findings—Review.

The appellate court will not set aside findings of facts by the trial court, especially in contested election cases, if such findings are supported by competent evidence.—P. 437.

4. Elections—Contests—Vote—Fraud—Rejection. .

Where fraud and irregularities occur in the conduct of an election to such an extent that it is impossible for the contest tribunal to separate with reasonable certainty the legal from the illegal or spurious votes, the precinct wherein the fraud was committed should be excluded.—P. 438.

5. Elections—Fraud and Irregularities—Judges—Illiterate Voters—Affidavits of Illiteracy—Counting of Ballots.

Where, in an election precinct, one of the judges frequently left the polling place and remained away considerable periods while voting was going on, an unsworn substitute being appointed in his place, this continuing until the judge became so intoxicated as to be incapacitated for duty and compelled to sleep during much of the time of counting the votes; and when requested to assist an illiterate voter he refused and requested the other judges, who were of another political party, to do so, and to be sure to vote him against two prominent candidates; and alleged illiterates were assisted in the preparation of their ballots without making affidavits as to their illiteracy, and were assisted by unsworn interpreters; and 296 more votes were found in the ballot box than there were voters named on the

certified list as having voted, such additional names being found upon uncertified slips of paper; and the count of the ballots was made in a large part by unsworn and unauthorized persons, two of them being deputies of the contestee, and another a candidate for election, while the election officers were either asleep or sitting around smoking; and during the counting of the votes the room was crowded with onlookers who added to the confusion and opportunities for mistake, and very many of the ballots were marked on the outside with the number of the ballot so that they could be easily distinguished, and strangers were permitted to vote under the names of residents; and many of the people voting were seen in the precinct for the first time but a few days before election, and never after—to give judicial sanction to such actions is but to put a premium upon fraud and political corruption; and to suffer an election to be held, as was done in this precinct, would be to abandon all safeguards provided by the law of the land to insure a fair and equal election by secret ballot. It is not enough to say that these offenses are criminal and can be prosecuted as such, as this does not stop the fraud, it simply necessitates the procuring of other implements for the next election; while, if those for whose benefit the wrong is perpetrated failed to profit by it, the misconduct will soon cease. Such fraud and irregularities require rejection of the entire vote of the precinct, even though certain legal voters will be disfranchised thereby.—P. 439.

**6. Appellate Practice—Elections—Contests—Findings.**

Where, in an election contest, the court found that the integrity of the ballot had not been impaired; that the illegal ballots could be easily separated from the legal ones, and this it proceeded to do; such findings will not be disturbed on appeal, as this court is not sitting to review matters of fact passed upon and tried by a court in election cases; where the testimony is conflicting, as that court heard the testimony, saw the witnesses, and was better able to determine their credibility than is this court.—P. 442.

*Appeal from the County Court of Las Animas County.*

*Hon. Robert R. Ross, Judge.*

Election contest brought by Eugenio Garcia against J. U. Vigil. From a decree in favor of contestant, contestee appeals.

Decision *en banc*.　　　　　　　　*Affirmed.*

Mr. Justice Steele and Mr. Justice Gunter dissent, and Mr. Justice Goddard not sitting.

Mr. W. M. Bates, Mr. W. B. Morgan, and Mr. C. S. Thomas, for appellant.

Messrs. Elwell & Collins and Mr. Eusebio Chacon, for appellee.

Mr. James C. Starkweather, *amicus curiae*.

Mr. Justice Bailey delivered the opinion of the court:

This matter was submitted to the court *en banc*, for the reason that the constitutionality of the law permitting judges of the county court to interchange was involved. Inasmuch as that question has already been determined by this court in the case of *The Prudential Ins. Co. v. Hummer,* 36 Colo. 208, decided at this present term, we shall pay no further attention to it.

This is a contest over the election to the office of clerk and recorder of Las Animas county. Upon the face of the returns appellant, who is contestee, received thirty-four votes more than appellee, who was the contestor. The court found that contestor received twenty-three illegal votes, and contestee gained one, upon a recount of the ballots. Contestee received a plurality of 260 in precinct 31 of ward 4, in the city of Trinidad, which precinct was excluded by the trial court, thus making contestor's plurality 205.

The first error complained of by appellant is that the contest proceedings were not instituted within the time required by law, namely, within ten days after the day when the votes were canvassed. It appears that appellant was the clerk and recorder of Las Animas county and, as is by law directed, he called to his aid two justices of the peace of that

county to act as a board of canvassers. They made
and canvassed the vote upon the 15th of November,
and on the same day, from the county court of Las
Animas county, an alternative writ of mandamus
issued, commanding the canvassing board to show
cause why they should not canvass what was known
as the Bradford returns from Primero precinct, and
upon the same day this alternative writ of mandamus
was made absolute.

Upon the 16th day of November a writ of injunction was issued from the district court of the
third judicial district, restraining the respondent
from acting upon or in pursuance of this judgment
of the county court. An alternative writ of mandamus was also issued, compelling them to show
cause why they should not canvass what was known
as the McPherson returns from the Primero precinct.

This suit came on for trial on the 20th of December, 1904, and final judgment was rendered, from
which a writ of error was sued out to the court of
appeals and supersedeas applied for, which application was denied.

Upon the 30th day of December the board of
canvassers re-convened and completed its canvass,
canvassing, as the court directed, the McPherson returns from Primero precinct. Within ten days after
the 30th day of December these proceedings were
instituted before the county court of Las Animas
county.

The contention of appellant is that the proceedings should have been instituted within ten days
after the 17th of November, when the canvass was
completed, with the exception of the Primero precinct which was involved in the litigation; that, inasmuch as the returns from the Primero precinct
did not change the result, so far as the office of
county clerk was concerned, but simply lessened the

appellant's majority, the canvass, so far as these two offices were affected, was completed upon the 17th day of November. We cannot agree with this contention. The statute provides that the contest must be filed "within ten days after the date when the votes are canvassed." This means all of the votes. It does not mean a sufficient number to show that one or the other of the parties was elected, but it means the votes of the entire county, and if for any reason one or more precincts are not canvassed, at the time of the first sitting of the board, the statute will not commence to run until those precincts are canvassed, even though the returns from those precincts, when counted, will not affect the result as between candidates for any single office. If this is not true, then the time for the filing of the contest would be an uncertain period, because the time would commence to run as soon as it was determined that the candidates for one or more of the offices were elected.

The period of ten days did not commence to run until after the 30th day of December, at which time the canvassing board completed its canvass, under the direction of the district court.

The second contention of appellant is that this matter is *res adjudicata*. It appears that upon the 26th of November, 1904, appellee instituted a contest against appellant for the same office, and growing out of the same election for which this contest was instituted. The statement of contest was answered and a replication filed, and upon the 29th day of December, the cause came on for hearing and was dismissed on the motion of contestor, over the objection of the contestee.

It is insisted that this dismissal over the protests and objections of the contestee was a bar to the right of appellee to institute another proceeding of the same nature.

*Hallack v. Loft,* 19 Colo. 80, and other cases, are cited in support of this contention.

What the court said in the case mentioned was:

"A judgment of nonsuit or mere dismissal is no bar to another action for the same cause  *  *  ⁓  *  Our conclusions are that the judgment of dismissal is a final judgment and put an end to plaintiff's action, but that it was not a judgment upon the merits and so did not put an end to his cause of action. He is therefore at liberty to commence another action for the same cause."

The authority cited is in direct opposition to the contention of appellant, and is the rule of practice which has invariably been adopted in this state. —*D. & R. G. R. R. Co. v. Iles,* 25 Colo. 19; *Martin v. McCarthy,* 3 Colo. App. 37; *Freas v. Englebrecht,* 3 Colo. 377; *County Com. v. Schradsky,* 31 Colo. 178.

In *Charles v. People's Ins. Co.,* 3 Colo. 419, it is stated that an order of dismissal is simply the blowing out of a candle that may be relighted at pleasure.

The court found "that in precinct 31, ward 4, city of Trinidad, the entire returns are so far vitiated and discredited by the gross frauds and irregularities committed in said precinct by the judges and clerks of election and intermeddlers, that the entire vote of said precinct should be rejected." This general finding is based upon the further special findings that one of the judges of election in precinct 31 was intoxicated, and was absent many times from the polling place during the casting of the ballots; was asleep during a large part of the time in which the ballots were counted; that he electioneered against a portion of the Republican ticket in the polling place; that a large number of foreigners, who were designated and known as "strikers," were huddled together in quarters adjacent to, and in, the macaroni

factory located in this precinct; that these strikers were supported by the strike committee and were not *bona fide* residents of the precinct; they cast their votes and immediately disappeared; persons who were not registered voted on the names of registered voters who did not vote; that persons were assisted in preparing their ballots by interpreters who were not sworn; that many persons were assisted who were not sworn as to their own inability, but no record of assistance was kept; a large number of intruders and persons not sworn assisted in keeping the tallies or in reading off the ballots; that during a portion of the time there was but one sworn officer assisting in the counting and canvassing of the votes; two deputy clerks in the office of the contestee unlawfully participated in the count and canvass of the votes, neither of whom were sworn officers of said precinct, and said deputies are still holding office under the contestee. The candidate for justice of the peace upon the Democratic ticket assisted in counting the votes. The registration in this precinct was greatly in excess of all previous elections; the secrecy of the ballot was destroyed; almost every ballot bore a distinguishing mark, showing the number of the ballot, and the ballots were not numbered in pen and ink, as required by law, but were folded and then marked with an indelible pencil in such a manner as to leave the number plain and visible upon a portion of the ballot.

The trial court, in addition to its findings, rendered an opinion in which it is stated that about 296 more ballots were found in the box than appeared on the polling list kept by the clerks; that this irregularity was sought to be explained by presenting some loose sheets of paper on which the names of 296 voters appeared, but that these loose sheets were not certified to or were not in any way authenticated by

the proper election officials as being a part of the polling list.

Counsel for appellant contends that these findings are all wrong and are against the weight of the testimony, and requests this court that a thorough examination of the abstract be made for the purpose of determining upon which side the testimony predominates.

We have made a careful examination of the record, and find that there is legal and competent testimony upon which the court might have made its findings. As to the intoxication and electioneering of the judge of election, there is practically no dispute and many of the other findings are supported by a great preponderance of the testimony. However, it will serve no good purpose to analyze the testimony of the several witnesses for the purpose of determining whether the findings are supported by a preponderance of the testimony or not. If there is anything that is well settled in this state, it is that this court will not set aside the findings of fact of the trial court if they are supported by competent testimony.—*Jordan v. Greig,* 33 Colo. 380; *Gwynn v. Butler,* 17 Colo. 114. And this is particularly true in cases of contested election.—*Leighton v. Bates,* 24 Colo. 311; 3 Current Law, 1177.

The findings of the court, being supported by legal testimony, will not be disturbed.

It is urged with great force that the vote of this precinct should not be rejected, because by rejecting it legal electors who honestly cast their ballots will be disfranchised and will have lost their right to vote, through no fault of theirs, but because of the misconduct of others. There is force in this contention. If possible to avoid it, the innocent should never lose their votes because of the misconduct or the negligence of others, but, under our form of gov-

ernment, if there is anything that should be held sacred, it is the ballot; and if the aspirants for office, the election officials, and the party leaders so far forget themselves as to commit, or permit the commission of, gross frauds, so that the will of the legal electors cannot be determined, there is nothing left for the courts to do but to set aside the election in the precincts contaminated by such fraudulent conduct. —*Att'y Gen. ex rel. v. Stillson*, 108 Mich. 414.

Where fraud and irregularities occur in the conduct of an election to such an extent that it is impossible for the contest tribunal to separate with reasonable certainty the legal from the illegal or spurious votes, the precinct wherein the fraud occurs should be excluded. This is the well settled law.

If this were not the law, one or two precincts in which the election is fraudulently conducted could practically disfranchise the legal voters of all the remaining precincts in the county. If any persons are to lose their votes by reason of the misconduct of the election officials, it should be those who reside in the precinct wherein the wrong-doing occurs, rather than to have the legal and honest votes in honest precincts overcome by fraudulent conduct taking place in other precincts over which they have no control.

It is seriously contended that many of the irregularities in this precinct were the result of accident, or occasioned by mere oversight, and that there was no intention to commit fraud. It requires a great deal of credulity to maintain that an election board in a city of the size and intelligence of Trinidad could be so ignorant as not to know that the law was transgressed most flagrantly by every person employed in conducting this election.

The Australian ballot law was enacted for the purpose of promoting purity of elections, and if it should be said that the fact that one of the judges of

election frequently left the polling place and remained away for considerable periods while voting was going on, an unsworn substitute being appointed in his place, this continuing until the judge became so intoxicated as to be incapacitated for duty and compelled to sleep during much of the time that the votes were being counted; that, when requested to assist an illiterate voter, he refused, and requested the other judges, who were of another political party, to do so and to be sure to vote him against two prominent candidates; that a judge of election can use his position to electioneer against certain candidates; that alleged illiterates could be assisted in the preparation of their ballots without making affidavit as to their illiteracy, as the law demands; that illiterates could be assisted by unsworn interpreters; that where 296 more votes were found in the ballot box than there were voters named on the certified list as having voted, but the additional names were found upon uncertified slips of paper; that the count of the ballots was made in a large part by unsworn and unauthorized persons while the election officers were either asleep or sitting around smoking, the persons making the count being two of the deputies of contestee, and another a candidate for election; that during the counting of the votes the room was crowded with onlookers who added to the confusion and opportunities for mistake; that very many of the ballots were marked on the outside with the number of the ballot, so that they could be easily distinguished; that persons other than the judges of election prepared some of the ballots for illiterates; that strangers were permitted to vote under the names of residents; that many of the people who were permitted to vote were for the first time seen in the precinct but a few days before election, and never after; should be looked upon as mere irregularities which do not

affect the purity of the ballot, then we are unable to determine what conduct will be sufficient to set aside the election. To give judicial sanction to such actions is but to put a premium upon fraud and political corruption. To suffer an election to be held, as was done in this precinct, would be to abandon all safeguards provided by the law of the land for insuring a fair and equal election by secret ballot.— *Banks v. Sergent,* 104 Ky. 849; *Combs v. Eversole,* 70 S. W. 638.

It is not enough to say that these offenses are criminal and can be prosecuted as such. This does not stop the fraud; it simply necessitates the procuring of other implements for the next election. If those for whose benefit the wrong is perpetrated fail to profit by it, the misconduct will soon cease.

But, it is said, that there was no fraud intended, and that there is nothing to show that contestor suffered on account of any of these things. This will not avail. The conduct of election officials may, though actual fraud be not apparent, amount to such culpable negligence as to render their doings unworthy of credence. If the misconduct has the effect of destroying the integrity of the returns and avoiding the *prima facie* character which they ought to bear, such returns should be rejected.—McCrary on Elections, §§ 488-540.

In *Tebbe v. Smith,* 29 L. R. A. 676, the supreme court of California, in relation to the irregular conduct of an election, says:

"In this we are quite willing to believe that the misconduct of the officers of Lake precinct was prompted by nothing worse than ignorance, and lack of appreciation of the responsibility of their position, and we may say further, that no harm is shown to have resulted from this conduct; but looking to the purity of elections, and the integrity of the ballot

box, we are constrained to hold that conduct like this amounts, in itself, to such a failure to observe the substantial requirements of the law as must invalidate the election.''

In *Sweeny v. Hjul,* 23 Nev. 409, it appeared that in a certain precinct the election judges neglected to remove the perforated slip containing the printed number of the ballot. There was no allegation of fraud, yet the vote of the entire precinct was thrown out, because these ballots could be thus distinguished. There is no difference in principle between that case and this one, where the marking was done with pencil instead of ink, and in such a manner as to leave the carbon impression of the number on the ballot.

In *Kelso v. Wright,* 81 N. W. 805, the supreme court of Iowa held that what constitutes an identifying mark upon a ballot is a question of fact for the trial court, and the finding is conclusive upon appeal.

In *Attorney General v. McQuade,* 94 Mich. 439, it is held that the provisions of the election law require the voter to enter the booth alone and prepare his ballot concealed from view, and the section providing for the marking of the ballots of illiterates, are mandatory and must be strictly adhered to or the vote rejected.

See, also, *Attorney General v. May,* 99 Mich. 538.

Here it is found by the trial court, that many persons who were assisted were not sworn as to their ability, and no record of assistance was kept. If this can be permitted, then the provisions of the law are without avail. It will be possible for any number of voters to market their votes and call in the judges to see that the goods are properly delivered, wherefore this act, made for the preservation of pure elections, will become a machine in aid of corruption.

Appellant earnestly contends that the court erred in not excluding entirely the vote of precinct

No. 46,·otherwise known as Primero. The contention is based exclusively upon matters of fact concerning which the testimony was conflicting. The court found that the integrity of the ballot had not been impaired, that the illegal ballots could be easily separated from the legal ones, and this it proceeded to do. The trial court heard the testimony, and saw the witnesses, and was better· able to determine their credibility than we are; consequently, his findings in this respect will not be disturbed. We must again say that this court· is not sitting to review matters of fact passed upon by the trial court in election cases, where the testimony is conflicting.

This practically disposes of the case. While many other alleged errors are discussed in the briefs, they are for the most part based upon disputed facts, and we are not inclined to disturb the finding of the court in such matters. However, if we should determine each of the remaining matters in the manner contended for by appellant, it would not affect the result.

The trial court having committed no substantial error, the judgment will be affirmed.

*Affirmed.*

Decision *en banc*.

Mr. JUSTICE GODDARD did not participate.

Mr. JUSTICE GUNTER and Mr. JUSTICE STEELE dissent.