[Nos. 8683, 8684, 8685, 8686.]

NEELLEY V. FARR.

ARCHULETA V. FREELAND.

SANCHEZ V. SANCHEZ.

YOUNG V. VALDEZ.

1. ELECTIONS—*Freedom of Essential.* It is of the essence of an election that every elector should be free to form and express an intelligent opinion, and that, in order to do this, there shall be no interdiction of, or interference with, the discussion of the questions presented to the electorate. If the voter is deterred from the free exercise of his will, or the expression of his choice, by any influence whatever, the election is not free, even though there be no violence or physical coercion. Whenever the voters have been put under constraint, by false practice, and intimidated, not slightly, and in individual cases, but generally, and to the extent of rendering the result uncertain, so that it is impossible to separate, with reasonable certainty, the false from the true, the whole poll must be rejected, even though thereby

honest voters may be deprived of their franchise. *Vigil v. Garcia,* 36 Colo. 430, followed. (518, 519.)

The principal industry of Huerfano County is coal mining, the mines being operated by certain corporations. In 1913 a strike of the miners, members of a certain union, occurred, and many disorders and acts of violence ensued. Federal troops were finally summoned to restore order. No rioting occurred after their appearance, but the agitation engendered by the strike and its attendant disorders still divided the community. The coal companies in the election of 1914 supported the ticket presented by the Republican party, while the opposite faction gave its support to that presented by the Democrats. The county commissioners, being Republicans, at the instance or with the connivance of the coal mining companies in July, 1914, changed the boundaries of certain election precincts so as to constitute the private properties of seven of the coal mining companies, an election precinct, surrounded by a fence in some instances, and protected by armed guards in all, so that each of these precincts was under the private control of the corporation. Every resident within these precincts was an employee of the corporations, or of their allied companies, with a single exception; the polling places were everywhere upon these private grounds, and the registration lists for the election were kept in the offices of the companies, and treated as their private property. During the months succeeding the establishment of these precincts the public of every class were excluded therefrom. Admission could be had only by permission of some officer of the corporation, or by the Republican candidate for sheriff. In one instance the Governor of the State, while upon official business, was denied admission to one of these "closed camps." Access to the registration lists was denied to the committee men of the Democratic party, and while the chairman of that party was permitted to name one judge of the election, he was compelled to select for the purpose one of the employees of the coal mining companies. Political discussion or political meetings were not permitted within the limits of these closed precincts. Only one such meeting was attempted, and many of the employees of the mining company, approaching the place thereof, were turned back by the manager of the corporation— so that the meeting was abandoned. Many of those who voted in these precincts were illiterate, and in numerous instances the judges of the election marked their ballots for them in violation of law; and the companies distributed, during the day of election, cards, so printed as to indicate to the illiterate voters the names of the Republican candidates as the ones proper to be chosen.

These things were admitted or undisputed, and were justified by the companies as an "industrial necessity." The companies excluded from their premises those who came there to indulge in political discussion, no matter how peacefully they conducted themselves, apparently regarding all such persons as agitators, and alleging that it was known from experience that if allowed, they would resort to threats of violence, and their employees might become frightened, and quit their employment. Many instances of

illegal voting appeared in the testimony, though not in number sufficient to change the result. It was shown, however, that in every one of the seven closed precincts the Republican candidate received a large majority over his opponent, and that in every other precinct of the county the Democratic candidate received a majority.

Upon contest of the election of the Democratic candidates thus defeated, the court said that no justification appeared for the control by the corporations of their private property, in this manner, after it had, by the erection of the new precincts, been dedicated to a public use.

The votes cast in each of the seven closed precincts were excluded from the count, the Democratic candidates and contestors were declared elected, and the Republican contestees ordered to vacate the office in each instance, and admit the contestor, immediately upon his qualification. (494-510, 519-520.)

2. ——*Registration of Voters—Right of the Public to Examine.* The statute contemplates that the list of registered voters shall be open to the examination of the public at the voting places in each of the precincts, and where such examination is prevented it must be assumed that such prevention was with an ulterior improper purpose. (505.)

3. COUNTY COMMISSIONERS—*Eligibility—Residence.* Under Rev. Stat. sec. 1196 the eligibility of a citizen to the office of County Commissioner is to be ascertained as of the time of his entering upon the duties of the office. (517, 518.)

4. APPEAL AND ERROR—*Conflicting Evidence—Fair Trial.* Where the conduct of the trial judge manifests bias and prejudice, *e. g.* the repeated exclusion of pertinent and competent testimony offered by the defeated party, the case is not within the general rule sustaining the trial court in its findings on conflicting evidence. (517.)

*Error to Huerfano County Court.* Hon. HENRY BLICKHAHN, Judge.

Mr. C. S. THOMAS, Mr. H. N. HAWKINS, Mr. JOHN L. EAST, Messrs. MULLINS & HELLER, Mr. ROMILLY E. FOOTE, and Mr. PHILIP HORNBEIN, for plaintiffs in error.

Mr. CHARLES HAYDEN, Mr. FRANK A. KEMP, Mr. JESSE G. NORTHCUTT, and Mr. HENRY W. COIL, for defendants in error.

Mr. Justice SCOTT delivered the opinion of the court.

These are election contests growing out of the general election in Huerfano county in November, 1914. The state-

ments of contests filed are in all respects identical, with the exception that different offices are involved, and different pluralities returned by the board of canvassers.

The plaintiff in error, E. L. Neelley, contested the election of J. B. Farr, defendant in error, for the office of Sheriff. Plaintiff in error, J. G. Archuleta, contested the election of defendant in error, W. H. Freeland, for the office of County Clerk and Recorder. Plaintiff in error, Charles H. Sanchez, contested the election of Jose S. Sanchez, defendant in error, for the office of County Assessor, and plaintiff in error, Robert Young, contested the election of Antonio D. Valdez for the office of County Commissioner. The cases were consolidated for trial in the County Court, and are here consolidated and submitted upon the same testimony, and the one record. Separate judgments were rendered in the County Court dismissing each of the contests. We consider specifically the contest for the office of sheriff.

The official abstract of the board of canvassers shows the vote of each of the candidates in the entire county, to be as follows:

J. B. Farr ..................... 2,553 votes
E. L. Neelley .................. 2,224 "
                 Farr's plurality ........ 329 votes

For County Clerk and Recorder.
J. G. Archuleta ................ 2,235 votes
W. H. Freeland ................ 2,418 "
                 Freeland's plurality .... 173 votes

For County Assessor.
Jose S. Sanchez ................ 2,466 votes
Charles H. Sanchez ............. 2,235 "
                 Jose Sanchez' plurality.. 231 votes

For County Commissioner.
Antonio D. Valdez ............. 2,370 votes
Robert Young ................. 2,280 "
                 Valdez' plurality........ 90 votes

The grounds of contest were:   (a) That illegal votes were received of sufficient number to change the apparent result of the election; (b) that legal votes favorable to contestor were rejected by the election officials sufficient to change the apparent result of the election; and, (c) that there was malconduct, fraud, and corruption, on the part of the election officials in various voting precincts sufficient to change the result of the election.

The specific allegations as to malconduct were in substance: That the defendant in error has been the acting sheriff of Huerfano county for a great number of years, and that at all times during his incumbency as sheriff, used said office for the purpose of controlling the government of the County of Huerfano in behalf of himself and other officials, and certain corporations engaged in coal mining in said county, and that the said defendant in error, as sheriff, and other officials, including the Board of County Commissioners, and certain corporations engaged in coal mining, did prior to the general election, conspire to thwart the will of the qualified electors of Huerfano county, and to corrupt the ballot.   That in pursuance of said conspiracy the said defendant in error and other officials did create various precincts in the said county of Huerfano, in such manner that such precincts could be wholly controlled by the various mining corporations therein operating, and did establish and create precincts, so that no person could reside therein, or would be permitted to vote therein, except persons employed by certain coal mining corporations operating in said precincts, and that the precincts thus created and established were known as Cameron Precinct No. 27, Rouse Precinct No. 22, Pryor Precinct No. 21, Oakview Precinct No. 20, Walsen Mines Precinct No. 18, Ravenwood Precinct No. 15, and Niggerhead Precinct No. 14; and that said precincts were known as "closed camps" and comprised territory solely owned and controlled by various mining corporations,

and that no person was permitted to enter the territory of said precincts without the consent of the officials of said mining companies. It was further alleged that said precincts were so established and bounded, in furtherance of the conspiracy, and with the specific purpose of enabling the defendants in error to control the election in said precincts, and to prevent the plaintiffs in error and other candidates nominated by the same political parties, from making any investigation of the qualifications of the voters in said precincts, and for the purpose of corrupting the ballot in said precincts, and committing fraud in and about the conduct of the election, so that the election of the defendants in error would be insured. It is further alleged that in furtherance of said conspiracy, the County Commissioners did so establish and arrange precincts in various places, with the view of making said voting precincts inaccessible to a great number of qualified electors who were entitled to vote, and were known to be opposed to the plaintiffs in error. That on account thereof a great number of qualified electors were compelled to travel a great distance in order to cast their ballots. That other qualified voters did not go to the polling places. That the defendants in error, in pursuance of said conspiracy, intimidated and coerced a great number of persons in the county of Huerfano, who were dependent upon the county for support, to vote for the defendants in error. That the defendants in error did conspire with said coal companies, and a great number of election judges, who were named and designated through the influence of defendant in error, and said coal companies, to permit a great number of persons who were not qualified electors, to vote at said general election, and that the votes of a great number of persons who were not qualified to vote were received at the election, and that in furtherance of said conspiracy a great number of legal and qualified voters were denied the right to vote. That in furtherance of said conspiracy cer-

tain judges of election, designated through the influence of the defendants in error, assisted a great number of illiterate persons to vote, although said persons were in no respect physically disabled.  That the defendants in error, acting in conjunction with said coal companies, did procure the appointment and designation as judges of election of a great many persons who were employees, agents, superintendents, managers and bosses of a number of employes of corporations engaged in carrying on mining and manufacturing in said county of Huerfano, and that the voters voting in said precincts controlled by said mining companies were under the control of the judges of election, and that the employes of the coal mining companies were thus designated as judges, for the purpose of unlawfully coercing and intimidating the votes of employes at said election.  That in pursuance of said conspiracy the said 'coal companies did coerce and intimidate persons employed by them, and did threaten them with discharge and loss of employment, if they did not vote for the defendants in error.

There were additional allegations specifying alleged frauds in each of the said precincts, and in others.

The answers of the contestees were the same in each case, except that in the case of *Young v. Valdez* the answer set up that contestor Young was not a resident of the Commissioner District from which he was a candidate, and for such reason was not eligible to that office.

The answer denied generally, that there was any such conspiracy as charged in the statement of contest; denied specifically the charges as to the receiving of illegal votes, and the rejection of legal votes, and made counter charges of a similar nature.  The answer also charged a conspiracy between the democratic party of Huerfano county, and a labor organization known as the United Mine Workers of America, to corruptly control the election in that county.

The contestors filed their separate petitions for a

change of venue because of the alleged bias and prejudice of the judge, in which it was charged in substance as follows:

"First: That the contestor herein fears that he will not receive a fair trial in the court in which this action is pending, on account that the judge hereof is interested and prejudiced against the contestor, and that the contestor cannot have nor expect a fair and impartial hearing and decision of the issues involved herein for the following reasons:

A. That J. B. Farr, the contestee herein, known as Jeff Farr, is the political leader and controls the machinery of the local Republican Political Organization and dictates all nominees, and did dictate all nominees to be placed upon the said ticket at the last general election; that the said Jeff Farr determines who shall be supported for election, and who shall be defeated; that the said Jeff Farr has an undue influence over the judge of this court; that the said Jeff Farr has heretofore held the office of Sheriff of this county and is desirous of continuing to hold the said office of Sheriff of this county, and is desirous of defeating the contestor herein for the purpose of perpetuating himself in the said office of Sheriff, regardless of the merits of this cause; that it is essential to the very life of the said organization, and it is essential for the purpose of wielding the power that the said Jeff Farr has heretofore and does now wield, that he the said Jeff Farr be sustained in the present contest for the office of sheriff, and if the said contestee herein is not sustained in the present cause, then the power of the said Jeff Farr and the said local Political Organization will be destroyed and dissipated and the judge hereof, should he have any aspirations for future political elevation, would be unable to realize them.

B. That the said Judge of the court is under obligations to the said Jeff Farr and the said local political organization for his present position and past political positions

that he has heretofore held in said county, and by reason of the said past political affiliations the judge of this court has become and is prejudiced against the contestor herein.

Second: That there has existed and does now exist in this county a long and deep-seated rivalry amounting to enmity between the members of the various local political organizations in the said county; that by reason thereof the judge of this court has a personal animosity against the contestor herein as well as all other members of the local political organization to which the contestor herein belongs, to-wit: the local Democratic party.

A. That the enmity between the members of the organization with which the judge of this court is affiliated and the members of the organization with which the contestor is affiliated has been so tense and severe that bodily violence has been inflicted upon members of the contestor's party by the members of the party of the judge herein; that this enmity is of such a degree and is so bitter that the judge of this court cannot dis-associate himself of the personal feeling engendered in the said political controversies, and particularly in the political controversy that is here to be tried."

Numerous affidavits were offered in support of and in opposition to, the petition and the same was denied by the court.. The testimony in the case was confined chiefly to the said seven alleged closed election precincts, and the official abstract of the board of canvassers shows the vote of each of said candidates in the said precincts as follows:

| | Niggerhead | Ravenwood | Walsen Mine | Oakview | Pryor | Rouse | Cameron | Total |
|---|---|---|---|---|---|---|---|---|
| **For Sheriff** | | | | | | | | |
| Farr | 56 | 49 | 201 | 81 | 77 | 164 | 49 | 677 |
| Neelley | 9 | 1 | 5 | 14 | 6 | 6 | 5 | 46 |
| Farr's majority, 631. | | | | | | | | |
| **For County Clerk and Recorder** | | | | | | | | |
| Archuleta | 12 | 1 | 4 | 21 | 4 | 6 | 10 | 58 |
| Freeland | 49 | 45 | 196 | 73 | 77 | 161 | 46 | 645 |
| Freeland's majority, 587. | | | | | | | | |
| **For County Assessor** | | | | | | | | |
| C. H. Sanchez | 13 | 1 | 3 | 19 | 4 | 7 | 8 | 55 |
| J. S. Sanchez | 52 | 51 | 204 | 78 | 78 | 165 | 47 | 675 |
| J. S. Sanchez's majority, 620. | | | | | | | | |
| **For County Commissioner** | | | | | | | | |
| Young | 15 | .. | 6 | 18 | 3 | 8 | 8 | 58 |
| Valdez | 49 | 51 | 195 | 77 | 76 | 158 | 46 | 652 |
| Valdez's majority, 594. | | | | | | | | |

We do not consider the vote in Ideal precinct for the reason that the testimony concerning it is somewhat confusing, and for the further reason that it is not material to a determination of the case.

It will be observed from the return of the board of canvassers, that the entire vote cast in the county for the office of sheriff was 4777. In the seven closed precincts the total vote cast for that office was 723. In these precincts Farr's apparent majority was 631, while in the entire county outside of such precincts, his opponent Neelley received a majority of 302 votes.

For the office of County Clerk and Recorder, the contestee received in the closed precincts a majority of 587 votes, while in the entire county outside of these precincts the contestor received a majority of 414 votes. For the office of County Assessor the contestee received in the closed precincts a majority of 620 votes, while in the entire county outside of these precincts the contestor received a majority of 389 votes. For the office of County Commissioner the

contestee received in the closed precincts a majority of 594 votes, while in the entire county outside of these precincts the contestor received a majority of 504 votes.

The chief industry in Huerfano county is coal mining, and the mines are principally owned by the coal corporations known as The Colorado Fuel and Iron Company, The Victor Fuel Company, and one or two others as appears from the record, but chiefly by the companies named.

In September, 1913, the Union Miners, members of the United Mine Workers of America, entered upon a strike in the coal fields. The coal companies became united in their interests as opposed to the contentions of the miners. There were many acts of violence, the militia was called to the district, and finally the Federal troops were brought to the scene of action to preserve the peace.

Counsel for contestees, well described the situation and condition of the mines as appears from the record in saying: "around the shaft of each mine are clustered the tipple, the mine office, the shops, sheds and outbuildings; and huddled close by, within a stone's throw, cottages of the miners built on the land of, and owned by, the mining company. All the dwellers in the camp are employes of the mine. There is no other industry. This is 'the camp.' "

And again: "Of the eight 'closed camps' it appears that practically the same conditions existed in all of them, and those conditions were, in general, that members of the United Mine Workers of America, their organizers or agitators, were prevented from coming into the camps, so far as it was possible to keep them out, and to this end guards were stationed about them. Of the eight 'closed camps' one of them, 'Walsen,' was, and at the time of the trial still was, enclosed by a fence erected at the beginning of the strike in October, 1913; Rouse and Cameron were partly, but never entirely enclosed by fences."

It is admitted that all persons entering these camps

and precincts were required by the coal companies to have passes, and it is contended that this was an "industrial necessity."

Counsel for contestees in their brief say:

"These unusual circumstances shaped the political campaign of 1914. There was but one issue—the strike. Considerable has been alleged and denied touching the conspiracies with, the allegiance to, and support of, the opposite parties by the contending industrial disputants. Whatever may have been proved, or left unproved, in the trial of the cause, it is a matter of present, or of only recently past history, that the Republican party of the whole state, from the candidate for Governor down, and particularly those in Huerfano county, ran on what they were pleased to call a 'Law and Order' platform. This meant, or was taken to mean, that the Republicans sided against the strikers. Indeed, this was the open attitude of the Republican party in the strike district, and, whether rightly or wrongly, it was generally contemplated that the election of the Republican candidates would be a blow aimed at the strike conducted by the United Mine Workers of America."

The Federal troops entered the district in May of 1914, and the testimony is in agreement that no serious acts of violence occurred thereafter, and that order was preserved up to and subsequent to the election, and to the time of this trial.

It was under this condition that in July, 1914, the Board of County Commissioners changed certain of the election precincts so as to constitute each of such camps an election precinct, and with but one exception where a few ranches were included, these precincts were made to conform to the fences and lines around each camp, protected by fences in some instances, and by armed guards in all cases. Thus each election precinct by this unparalleled act of the commissioners was placed exclusively within and upon the

private grounds and under the private control of a coal corporation, which autocratically declared who should and who should not enter upon the territory of this political entity of the state, so purposely bounded by the County Commissioners.

With but the one exception, all the lands and buildings within each of these election precincts as so created, were owned or controlled by the coal corporations; every person resident within such precinct was an employe of these private corporations, or their allied companies, with the single exception; every judge, clerk or officer of election, with the exception of a saloon keeper, and partner of Farr, was an employe of the coal companies.

The polling places were upon the grounds and in the buildings of these companies; the registration lists were kept within the private offices or buildings of such companies, and used and treated as their private property

Thus were the public election districts, and the public election machinery, turned over to the absolute domination and imperial control of private coal corporations, and used by them as absolutely and privately as were their mines, to and for their own private purposes, and upon which public territory no man might enter for either public or private purpose, save and except by the express permission of these private corporations.

This right to determine who should enter such so-called election precincts, appears from the record to have been exercised as against all classes, merchants, tradesmen or what not, and whether the business of such person was public or private. Indeed, it appears that in one instance the Governor and Adjutant General of the state, while on official business, were denied admission to one of these closed camps. And that on the day of election, the democratic watchers and challengers, for Walsen Mine precinct, one of which was Neelley, the democratic candidate for sheriff,

were forced to seek and secure a detail of Federal soldiers to escort them into the precinct, and to the polls, and that such soldiers remained as such guard during the day and a part of the night.

The undisputed testimony of witness Newkirk is fairly illustrative of the system of espionage and exclusion by the coal companies, of citizens of the county from the closed election precincts during the political campaign. This witness testified in substance as follows:

"He resides in Walsenburg and is employed by McIntire in the furniture business. He went to Walsen camp sometime before the election to deliver furniture. Was stopped at the gate, was informed that he could not deliver in there. Was stopped again after he got into the camp, and told he would be arrested and thrown in jail if he was caught in the camp again. On another occasion he was stopped at the gate with a load of stuff that he had to take up. Was told by a guard that if he wanted to deliver goods up there he would have to get a pass from Jeff Farr. His employer, McIntire, has run a business in Walsenburg for some time, and when witness could not deliver the goods he came back, and went up the next morning and entered the camp where the fence was cut, up by the school house, but he never went back any more. The guard at the camp showed witness a list of names of people who were barred from the camp. Witness' name was not on the list nor was that of his employer. Krier's store was on the list. Krier is a merchant in Walsenburg, and witness thinks Krier is affiliated with the Democratic party. The C. O. D. Store and the Sporleder Selling Company were on the list. Mr. Tim Hudson, clerk of the District Court, was on the list. He is affiliated with the Democratic party. Neelley is connected with Neelley & Caldwell, and was a candidate for sheriff on the Democratic ticket last fall, M. A. Sanchez, who runs a store in Walsenburg, was on the list. Dr. Adbun-nur, a physician, and Mr.

East, an attorney, and Mr. Robert S. Mitchell, connected with the Independent paper, and chairman of the Democratic party, were on that list. On cross examination the witness testified that he did not know the guard's name. He was not a military man. The same man that showed witness the list told him about getting the pass from Jeff Farr. This occurred the latter part of 1914, and just before the election."

While there is testimony showing specific acts of fraudulent conduct in each of the closed precincts in question, yet there is not a sufficient number of votes so identified as to change the result of the election in the entire county. Some of these matters will be afterward referred to. So that the question to be determined is as to whether or not the conduct of the election in the seven alleged closed precincts was such as to invalidate the entire poll in such precincts, or in a sufficient number of them, to change the result of the election in the entire county.

It is clear that the Board of County Commissioners changed the boundaries of the seven named precincts in the month of July preceding the election in the manner and form, and with the effect as charged in the statement of contest. This was not denied nor disputed by the proof, though the conspiracy charge is denied by the answer of the contestee.

Robert S. Mitchell, Chairman of the Democratic County Committee, testified; that no one could enter the closed camps, or could on or about the time of the last general election, without permission; neither witness nor any representative of his, could enter the precincts for the purpose of meeting the electors, or discussing with them the issues of the campaign, or to advance the claims of the candidates of the Democratic party. There were signs and warnings on the fences surrounding Walsen camp indicating that it was private property, and, that no trespassing was allowed.

In Oakview and Oakdale precincts, that portion of the precinct wherein the polling place was, was the same as in the Walsen camp. There was no way available by which witness could ascertain, as chairman of the democratic party, whether such names appearing on the registration book were in truth and in fact qualified electors. He does not believe that he could have entered the precincts for the purpose of discussing the issues of the campaign.

In Ravenwood precinct witness believes that there was no one residing there but employes of the Victor-American Fuel Company; the public was excluded from that precinct by means of guards; witness could not enter the precinct for the purpose of meeting the electors or discussing with them the issues of the campaign, and could not make a check of the registration list. Cameron, Ideal, Pryor, Midway and Rouse precincts were in practically the same condition. There are coal companies operating in each of these precincts, and the public was excluded. Witness was unable to make a canvass of any of these precincts, or investigation of the qualifications of the persons whose names were on the registration list, and could not enter any of such precincts for the purpose of discussing the issues of the campaign. The challenge list used in the Walsen Camp was gathered from different sources. Information was obtained from parties who had been in Pueblo, and had met different ones coming here, and information gained from men around town who knew some of the people at Walsen Camp; the challenge lists in the other precincts were made up in the same way. Prior to the last election a portion of the Badito Precinct was cut off and placed in Precinct No. 30, Tioga Precinct. As a result of this change the voters in Tioga Precinct had to make a trip of about nineteen miles. The great majority of the voters had about eighteen to twenty miles to go.

But if there was any doubt concerning the condition of

the closed camps and precincts, and the exclusion of representatives of the democratic party from discussing the issues of the campaign within the precincts comprising the closed camps, it is entirely removed by the testimony of the witness Weitzell, for contestee. He testified that he was a resident of Pueblo, and was manager of the C. F. & I. Company; that Rouse, Lester, Ideal, Cameron, Walsen, Pictou and McNally, are camps under his jurisdiction. That he had general charge of the camps and that there was no company official in Colorado superior to him in this respect except the president; that the superintendent and other employes are under his supervision; that the Federal troops came about the 1st of May, 1914, and continued until January, 1915; that in all those camps he tried to keep out the people who were antagonistic to the company's interests; that it was private property, and so treated by his company; that through him the company and its officials assumed to exercise authority as to who might or who might not enter; that if persons could assure or satisfy the man at the gate, or the superintendent, that they were not connected with the United Mine Workers, or in their employ as agitators, they were let into the camp. That no one we were fighting against got in for social intercourse, or any other; that he and the officials under him assumed to pass upon the question of whether or not any person coming there came for the purpose of agitation. That Mr. Mitchell, the chairman of the democratic committee, as he recalled it, was identified with the agitators, ran a newspaper and was connected either directly or indirectly with the United Mine Workers; that Mr. Neelley, Democratic candidate for sheriff, was identified with the strikers, and that he would be considered as an objectionable character. That when the Federal troops came, they restored peace and normal conditions, there was no rioting after that; there was no fear on the part of the company when the Federal soldiers were here, except fear

of agitation.   Asked if he guarded the camp against dis-
cussion, against the espousal of the cause of the company,
he replied, 'We didn't encourage it.'  The company would not
encourage organizers to come into the camp, no matter how
peaceful they conducted themselves; that the company did
not permit men to come into the camp to discuss with the
employes certain principles, or to carry on arguments with
them, or to appeal to their reason, or to discuss with them
things along reasonable lines, because it was known from
experience that if they were allowed to come in they would
resort to threats of violence.  They might not resort to any
violence at the time, but it might result in the people becom-
ing frightened, and leaving, and they were anxious to hold
their employes.  He was asked whether or not one had busi-
ness there depended upon the decision of the official in
charge, he replied that the superintendent probably would
inquire of him what his business was.  That any one that
asked Jeff Farr for a permit to enter the camp would likely
get it.

Upon objection of counsel for contestee this witness
was not permitted to testify as to the relationship as between
the Colorado Fuel and Iron Company and sheriff Farr, with
reference to politics.

The testimony is clear that Farr issued permits for
entrance to the closed camps and precincts, both before and
during the campaign, and that all republican candidates
were permitted to enter such camps at their pleasure.  It
is equally clear that all democratic candidates, particularly
the contestors, the county chairman, and others represent-
ing the democratic party were excluded from these precincts
before the campaign, and while the same was pending.

The record discloses two exceptions to this rule of the
coal companies.

The contestor Young, had for many years worked in
the mines, and was friendly with the superintendent of the

Walsen mine, and because of which was admitted within some of the precincts. Young testifies that he secured permission to meet the people in Ravenwood precinct, and examine the registration book. That he found the registration book in the private room of one Leo, a shot firer on the mine. That in another precinct he was about to take dinner with a relative of the person who was with him, when the camp marshall said to him "There ain't nobody going down there. I am not allowed to let anybody visit here." That he and the person with him had distributed some cards of candidates, that this was done without the knowledge of the company officials, and this fact coming to the knowledge of the superintendent of the mine, that official said to him, "Bob, if I had known you was going to scatter this literature, you could not have gotten into the camp; that nobody distributing literature could get into the camp." Kaiser, the superintendent of the mine, testified upon this point as follows:

"And so, after Mr. Young came up close to the office I went over to him and says: 'Bob, you told me you wanted to go through the camp and talk with the people and look at the registration books.' I says: 'if you wanted to do anything else why didn't you mention it at the time. It wasn't necessary for you to come here and deceive me; if you wanted to distribute literature or cards or anything else, you could do it as far as I am concerned, but I do wish you would have had enough respect for friendship to come and tell me what you wanted to do and stuck with it.' He says: 'I didn't do it, that man did it.' I says: 'That man had no conversation with me whatever; he is a friend of yours and he is here with you, and naturally I would expect this thing to be handled by you.' "

This witness testified as to the same situation with regard to registration books in other of the closed precincts.

There was but one attempt to hold a political meeting

in the closed precincts. Joseph Patterson, who attempted to hold this meeting testifies concerning it as follows:

"Was at a political meeting at Oakview. Had been a warm personal friend of Mr. Jones, the assistant superintendent of the Oakview mine, and had written him a letter asking the courtesy of holding a political meeting. On Saturday evening received a letter that he could hold such meeting. On the day previous to the meeting witness received a 'phone message from the assistant superintendent, in which the latter inquired whether witness was coming up there to cause any trouble, and witness replied, certainly not, and if the superintendent felt that way they would not come. Had advised the superintendent that he and others were going to hold a political meeting for the democratic party. Jones, the superintendent, stated that witness should come to the office that night before he went to the school house for the purpose of the meeting; when witness arrived at the meeting there were about six or eight English speaking people, and a dozen to fourteen Mexicans. The superintendent, Mr. Morgan, and Mr. Price were outside of the door most of the time. Witness noticed that the first few fellows that came toward the school house, the superintendent stopped and talked with them, and they turned back to the camp. This happened several times; as soon as they talked with Morgan they turned back. After he saw that, witness went into the school house and said that it was no use to hold any meeting, that it seemed that nobody was allowed to come. This meeting was supposed to be in a public school house on the company property. Had to get permission from the superintendent of the Oakview Mining Company to hold said political meeting."

While the democratic candidates, or the county committee may have been able to secure a list of registered voters from the County Clerk, as suggested by counsel, yet the law contemplates that these shall be open to the public

at the voting precincts, and if the law in this respect was defied, we must assume that it was for an ulterior purpose. But of what avail can be the registration lists, if parties, candidates and citizens are denied the opportunity to investigate the qualifications of the persons registered and thus be prepared to purge the lists, which the law contemplates, and for which it provides in the interest of honest elections.

It is undisputed that this was the case in all the closed precincts. The very fact of the denial of such right is a patent badge of fraud. Speaking of the importance of this provision of the law, it was said by Mr. Justice Brewer, *State v. Butts*, 31 Kas. 537:

"At any election in which much interest is felt, and where the opposing parties are supposed to be nearly equal in numbers, most careful scrutiny will be made of these registry lists, every voter's name and residence taken, and his right to vote verified by examination. The matter will not be left to the pressure and excitement of election day, but will all be ascertained and determined prior thereto. The value of such a registry for the preservation of the purity of the ballot box cannot be too highly estimated."

It appears that the number of registered voters in the closed precincts was very largely in excess of the number of votes cast, and this of itself was sufficient to demand an open and fair investigation as to the qualification of the alleged voters.

It appears from the testimony that in those closed precincts many of those who voted were unable to speak or read the English language, and that in numerous instances, the election judges assisted such, by marking the ballots for them in violation of the law. Again, it appears that the ballots were printed so that the first letter of the name of each political party was printed in unusually large type. The coal company employees provided voters not familiar

with the English language, a card upon which was printed a large capital R corresponding with the letter R on the ballot in the word "Republican," and the testimony in relation to the use of this kind of card by such voters is as follows:

"This card could be slipped right down the ballot until the word R on the card corresponded with the first letter of the word republican and a mark placed right on the top. The card was of the same length as the column on the ballot having the names of the candidates, and their political designation, and the R was so arranged that if the card was placed lengthwise it would meet the R in the word Republican. These cards were distributed quite frequently during the day."

Just how many votes were cast in this way in the several closed precincts does not appear, but it is plain that it was a system. One of these cards in evidence shows the letter R to have been printed and not written. Thus such voters were not choosing candidates, but, under the direction of the companies, were simply placing the cross where they found the particular letter R on the ballot, so that the ballot was not an expression of opinion or judgment, not an intelligent exercise of suffrage, but plainly a dictated coal company vote, as much so as if the agents of these companies had marked the ballots without the intervention of the voter. No more fraudulent and infamous prostitution of the ballot is conceivable.

There is testimony to the effect that very many votes were cast in these precincts in cases where the voters were disqualified for various reasons, but the detail testimony upon this point is of great length, and in many cases disputed, and it is not necessary to enter into a discussion of this phase of the case, except to say that this sort of fraud appears in abundance, though not in a sufficient number of cases to change the result of the election.

The foregoing is based upon admitted, or substantially

undisputed testimony and we have not entered upon a discussion of testimony concerning acts of coercion and intimidation, which is volumnious and concerning which there is dispute.

Counsel contend that the closed precincts were an "industrial necessity," and for such reason the conduct of the coal companies during the campaign was justified. However such conduct may be viewed when confined to the private property of such corporations in their private operation, the fact remains that there is no justification when they were dealing with such territory, after it had been dedicated to a public use, and particularly involving the right of the people to exercise their duties and powers as electors in a popular government.

The fact appears that the members of the Board of County Commissioners and all other county officers, were republicans, and as stated by counsel for the contestees, the success of the republican candidates was considered by the coal companies, vital to their interests. The close relationship of the coal companies and the republican officials and candidates, appears to have been so marked both before and during the campaign, as to justify the conclusion that such officers regarded their duty to the coal companies as paramount to their duty to the public service. To say that the closed precincts were not so created to suit the convenience and interests of these corporations, or that they were not so formed with the advice and consent of these corporations, is to discredit human intelligence, and to deny human experience. The plain purpose of the formation of the new precincts was that the coal companies might have opportunity to conduct and control the elections therein, just as such elections were conducted. The irresistible conclusion is that these closed precincts were so formed by the county commissioners with the connivance of the representatives of the coal companies, if not by their express command.

So that when these corporations elected to have their camps made election precincts, they of necessity, abandoned whatever private or exclusive control to which they may have been entitled as such, to the extent that such territory became so dedicated to the public use for election purposes, and entitled to the same due regard for the lawful rights of all interested citizens as in all other election precincts.

Thus the so-called industrial necessity was subordinated to the public use, and cannot serve as justification or excuse for the private and fraudulent conduct of public elections, nor for such inexcusable restriction upon the rights of citizenship.

The law will not distinguish between a free and open election in any one of these so-called closed precincts, and any other election precinct in the state. If the conduct of an election such as appears here, shall meet the approval of the courts, then it must be regarded as justifiable in every election precinct, and at every election. Such a situation is so repugnant to the spirit of free government as to appear inconcievable. Its certain result would be the destruction of popular government.

There can be no free, open and fair election as contemplated by the constitution, where private industrial corporations so throttle public opinion, deny the free exercise of choice by sovereign electors, dictate and control all election officers, prohibit public discussion of public questions, and imperially command what citizens may and what citizens may not, peacefully and for lawful purposes, enter upon election, or public territory.

It is true that the democratic chairman was permitted to designate a judge in each of these precincts, but he was compelled to make such selection from the employes of the coal companies, for, by reason of the precincts being so constituted there were no other persons from which a selection could be made, and each of these alleged democratic judges

who testified, said that he was a "Jeff Farr democrat," or a "Carlson-Farr democrat." Thus the so called democratic judges, by their own testimony, were coal company employees, supporting the republican candidates, who were likewise the coal company candidates, in a contest where counsel for the contestee declare the sole issue in the election was the strike.

Who can say that this was within the spirit or letter of the law which provides for party representation on election boards in the interest of fair and honest elections. It barred every opportunity in this respect, which the law provides for a fair and honest election.

The contestees made no offer of proof as to their counter charge of conspiracy as between the democratic party and the strikers, nor as to any fraud alleged in such counter charge, so that that question is not before us.

We are unable to find a precedent where like, or similar conditions, have been considered as in this case, wherein private corporations have assumed to deny the public character of an election, and to arbitrarily take charge of and conduct the same as if it were the sole private business of the corporation. These companies plainly connived with certain county officials to secure the creation of election precincts, bounded so as to include their private property only, and with lines marked by their own fences, or guarded by their own armed men, and within which were only their own employes. They excluded the public from entrance to such election precincts, labeled the same as private property, and warned the public that entrance thereon constituted trespass. They denied the right of free public assemblage within such election precincts, and likewise the right of free or open discussion of public questions therein. They denied the right to circulate election literature or the distribution of the cards of candidates within such precincts. They secured the selection of their own employes exclusively as judges

and clerks of election, and by the location of precinct boundaries, no other than their employes could so serve. They apparently made the registration lists from their pay rolls. They kept such lists in their private places of business, and in charge of their employes. They prohibited all public investigation within such election precincts as to the qualification of the persons so registered as electors of the precinct. Through their employes acting as election officials, they assisted numerous non-English speaking persons to vote by marking their ballots for them, in plain violation of the law. They provided other non-English speaking persons with the fraudulent device heretofore described, by which such persons might be enabled to vote the republican ticket, without being able to read either the name of the candidate or the party ticket for which they so voted. They coerced and intimidated their employes in many instances.

We find no such example of fraud within the books, and must seek the letter and spirit of the law in a free government, as a scale in which to weigh such conduct. We think the rule to be applied in this case is so well stated in the brief of counsel for the plaintiffs in error, as to deserve announcement here, as follows:

"It is the essence of free elections that the right of suffrage be untrammeled and unfettered. The elector must be free to vote his own choice; his ballot should represent and express his own intelligent judgment and conscience. In fine, there can be no free election unless there be freedom of opinion. Freedom of opinion is the very basis of all republican institutions. How can there be freedom of opinion, we ask, where the exchange of ideas is interdicted; where the dissemination of intelligence is forbidden; where men's political convictions are scrutinized by private authorities; where candidates of a leading political party are prevented from making an appeal to the judgment, reason, intelligence and patriotism of the electorate? To the end

that there may be freedom of opinion, in this country, it has been ordained by the organic law of both nation and state, that the right of free speech and free discussion should be inviolate, impervious to interference by the government itself."

What constitutes a free election under the general constitutional guarantee is well stated in the case of *DeWalt v. Bartley*, 146 Pa. 529, 24 Atl. 185, 15 L. R. A. 771, 28 Am. St. 824, in the following language:

"An election, to be free, must be without coercion of every description. An election may be held in strict accordance with every legal requirement as to form, yet if in point of fact the voter casts the ballot as the result of intimidation; if he is deterred from the exercise of his free will by means of any influence whatever, although there be neither violence nor physical coercion, it is not a free and equal election within the spirit of the constitution."

And in the case of *Richardson v. Rainey*, 1 Ellsworth Election Cases, 233, it was said:

"In giving the citizen the right to vote at all, the right to vote as he chooses, free and untrammeled, was necessarily included. It does not require any active restraint of the body to make out a case of intimidation. It need not be that there is, at the time of voting, the presence of threats, or of force, or the present fear of actual bodily hurt. The genius of free institutions demands that the mind, as well as the body, shall be free to exercise the elective franchise as the voter may see it."

And by Justice Story:

"No one can doubt the importance, in a free government, of a right to canvass the acts of public men and the tendency of public measures, to censure boldly the conduct of rulers, and to scrutinize closely the policy and plans of the government. This is the great security of a free government. If we would preserve it, public opinion must be en-

lightened; political vigilance must be inculcated; free, but not licentious discussion, must be encouraged." Story on the Constitution, Vol. II, 642.

The denial of the right of peaceful assemblage, can have been for no other purpose than to influence the election. There was no disturbance in any one of these precincts after they were created, up to the time of the election, and up to the time of this trial. The Federal troops were present, at all times, to preserve the peace and to protect life and property. There was no reason to anticipate any disturbance. Therefore this bold denial, was an inexcusable and corrupt violation of the natural and inalienable rights of the citizens.

It was said by Chief Justice Waite, in *U. S. v. Cruikshank at al.*, 92 U. S. 542, 23 L. Ed. 588:

"The right of the people peaceably to assemble for lawful purposes existed long before the adoption of the Constitution of the United States. In fact, it is, and always has been, one of the attributes of citizenship under a free government. It 'derives its source,' to use the language of Chief Justice Marshall, in *Gibbons v. Ogden,* 9 Wheat 211, 'from those laws whose authority is acknowledged by civilized man throughout the world.' It is found wherever civilization exists."

Speaking of the right to a free and open election, it has been said by this court in *Littlejohn v. People,* 52 Colo. 217, 121 Pac. 179, Ann. Cas. 1913D 610:

"In *People, etc., v. District Court,* 18 Colo. 26, 37, 38, 31 Pac. 339, 343, decided by Chief Justice Hayt and Mr. Justice Elliott, the latter, in a specially concurring opinion, in speaking of the extent of legislative power, under this constitutional provision, said: 'But I am firmly impressed with the conviction that it cannot be extended so far as to substantially impair the right of an elector to cast his vote at each election according to his own individual judgment

and preference, and to have the same counted as cast. These principles should not be lost sight of, either in legislation or in judicial decisions.'

This is necessarily true, because the constitution in the same article, section 1, declares, that every duly qualified elector 'shall be entitled to vote at all elections.' And further in section 5, of art. XI, 'That all elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of suffrage.' This means that every qualified elector shall have an equal right to cast a ballot for the person of his own selection, and that no act shall be done by any power, civil or military, to prevent it.' Such is the mandate and spirit of the constitution, and it thereby vests in the elector a constitutional right of which he cannot lawfully be deprived by any governmental power. While it cannot be questioned that the legislature has the power to prescribe reasonable restrictions under which the right to vote may be exercised, as said in *Nicholls v. Barrick,* 27 Colo. 432, 62 Pac. 202, nevertheless, such restrictions must be in the nature of regulations and cannot extend to the denial of the franchise itself. The test is, whether the effect of the legislation is to deny the franchise, or render its exercise so difficult and inconvenient as to amount to a denial. If the elector 'is deterred from the exercise of his free will by means of any influence whatever, although there be neither violence nor physical coercion, it is not' 'the free exercise of the right of suffrage,' and comes clearly within the inhibition of the constitution."

It is contended by counsel for contestees, that there is not sufficient evidence of a specific number of votes, wholly fraudulent, to change the result of the election and for such reason the contest must fail. The general rule in this regard, is well stated in *Jones v. Clidewell,* 53 Ark. 161, 13 S. W. 723, 7 L. R. A. 831, where it is said:

"There is a distinction, in the nature of things, between

particular illegal votes which may be proven and exactly computed, and which ought to be excluded wherever cast, and the effects of fraudulent combinations, coercion and intimidation. It can never be precisely estimated how far the latter extend. Fraud is secret and timidity shrinks from observation. Their effects depend on moral perversions, nervous organizations and constitutional idiosyncrasies. They cannot be arithmetically computed. Awe is silent and undemonstrative. Peace may be abject, as well as the result of satisfaction. Yet it cannot be said that elections are 'free and equal' where * * * fear deters from the exercise of free will, although there may be no turbulence. It would be to encourage such things, as the ordinary machinery of political contests, to hold that they shall only avoid to the extent their influence can be computed. It seems clear that courts must abnegate the power of preserving the freedom of elections, and abandon the polls to the violent and unscrupulous; or must take the ground that wherever such practices or influences are shown to have prevailed, not slightly and individual cases, but generally, and to the extent of rendering the result uncertain, the whole poll must be held for naught."

This principle has been adopted by this court in the case of *Vigil v. Garcia*, 36 Colo. 430, 87 Pac. 543. That case involved a contested election for the office of County Clerk and Recorder for Las Animas county. The case turned upon the validity of the election in one precinct.

It was held that the fraud and irregularities appearing, required the rejection of the entire vote of the precinct, even though certain legal voters will be disfranchised thereby. The result of this holding had the effect to change the result of the election in the entire county for the particular office. The alleged frauds in that case appear to be inconsequential as compared with the frauds appearing here, and the court declined to consider the contention that the alleged

frauds were the result of ignorance, and neglect, rather than intent. In that case it was said:

"It is urged with great force that the vote of this precinct should not be rejected, because by rejecting it, legal electors who honestly cast their ballots will be disfranchised and will have lost their right to vote, through no fault of theirs, but because of the misconduct of others. There is force in this contention. If possible to avoid it, the innocent should never lose their votes because of the misconduct or the negligence of others, but, under our form of government, if there is anything that should be held sacred, it is the ballot; and if the aspirants for office, the election officials, and the party leaders so far forget themselves as to commit, or permit the commission of, gross frauds, so that the will of the legal electors cannot be determined, there is nothing left for the courts to do but to set aside the election in the precincts contaminated by such fraudulent conduct. *Attorney General ex rel. v. Stillson,* 108 Mich. 414, 66 N. W. 358.

Where fraud and irregularities occur in the conduct of an election to such an extent that it is impossible for the contest tribunal to separate with reasonable certainty the legal from the illegal or spurious votes, the precinct wherein the fraud occurs should be excluded. This is the well settled law.

If this were not the law, one or two precincts in which the election is fraudulently conducted could practically disfranchise the legal voters of all the remaining precincts in the county. If any persons are to lose their votes by reason of the misconduct of the election officials, it should be those who reside in the precinct wherein the wrong-doing occurs, rather than to have the legal and honest votes in honest precincts overcome by fraudulent conduct taking place in other precincts over which they have no control."

It is contended further, that under the rule of this

court we may not disturb the findings of fact by the trial judge. The well established rule of this court in this respect, is that:

"Where there is a substantial conflict in the evidence, the general rule is that an appellate court will not review it, with a view to determine its sufficiency to support the finding of the trial court. But to this rule there are well recognized exceptions, as where the finding is the result of bias or prejudice, mistake or misapprehension, or misconception of the legal effect of the evidence; or where there is none. *Buelah Marble Co. v. Mattice*, 22 Colo. 547, 45 Pac. 432. Nor can a judgment but slightly supported by the evidence, and manifestly against its weight, be permitted to stand." *Rhode v. Steinmetz*, 24 Colo. 308, 315, 55 Pac. 814, 817.

Here there is no substantial conflict in the evidence as we have stated it, and upon which we determine the case, and this opinion and decision is based upon conduct concerning which there is no material conflict.

The defense relies not upon conflicting evidence, but upon the contention that the conduct of the election was justified as an "industrial necessity."

We have heard much in this state, in recent years, as to the denial of inherent and constitutional rights of citizens being justified by "military necessity," but this we believe is the first time in our experience when the violation. of the fundamental rights of free men has been attempted to be justified by the plea of "industrial necessity."

Even if we were to concede that there may be some palliation in the plea of military necessity, on the theory that such acts purport to be acts of the government itself, through its military arm, and with the purpose of preserving the public peace and safety, yet that a private corporation, with its privately armed forces, may violate the most sacred right of the citizenship of the state and find lawful

excuse in the plea of private, "industrial necessity," savors too much of anarchy to find approval by the courts of justice.

This case clearly comes within another exception to the rule, in that it is plain that the findings were influenced by the bias and prejudice of the trial judge.

A careful reading of the record discloses the rejection by the court of so much palpably pertinent and competent testimony offered by the contestors, as to force the conclusion that the trial judge was influenced by bias and prejudice, to the extent at least, charged in the application for a change of venue, and sufficient in itself to justify a reversal of the judgment.

It is further contended that the contestor Robert Young, was not a resident of the Commissioner District from which he was elected, at the time of the election, and, that for such reason his contest should fail.

Conceding for the purposes of this argument only, that if our statute determined such eligibility as of the date of the election, there might be force in this contention, yet the statute does not so determine, but, on the contrary, fixes the question of eligibility as of the time of entering upon the duties of the office. It reads, "When the contestee is not eligible to the office to which he has been declared elected." Therefore if the contestor had been declared elected, and had entered upon the duties of the office, in other words, if he was a party to this contest as contestee, his eligibility might be considered as of the time when he entered upon the duties of the office.

Discussing a similar statute, the Supreme Court of Iowa, in *State v. VanBeek*, 87 Ia. 569, 54 N. W. 525, 19 L. R. A. 622, 43 Am. St. 397, assigned as reasons for the rule here announced:

"It is contended that this makes ineligibility relate to the time of election, and that one then ineligible to hold office is ineligible to election, and therefore, cannot qualify,

though fully eligible at the time for doing so. In construing this language of the statute it should be remembered that courts must be slow to interfere with the choice of the people expressed at legally conducted elections, and that it is only when their choice is contrary to law that it will be set aside. If they elect one to serve them as sheriff who can legally qualify at the time required, no good reason appears for setting aside their choice. It is an eligible officer the law requires, and any person who can qualify himself to take and hold the office, is eligible to it at the time of the election. The construction claimed would prevent the election of one not of the required age at the time of the election, though he would attain to that age in time to take the office. It would prevent the election of one who would not be entitled to his second papers until after the election, though he could obtain the same, and fully qualify, by the time for taking the office. It is in harmony with the recognized rights of the people to freedom of choice in the selection of their officers to say that, in the absence of any provision as to qualifications for election, they may choose any person who is or may become eligible to take and hold the office at the time required for qualifying. If their choice shall be one who cannot qualify, it must be disregarded, for, as we have seen, it is only those who are eligible that can hold an office. If the person declared elected was under disabilities that could be removed, so as to render him eligible to take the office at the time required, we think it would be no ground for contest that he was not eligible to take the office at the time he was elected; in other words, one who may be eligible at the time for qualifying is eligible to the office at the time of election."

To the same effect is *Brown v. Goben,* 122 Ind. 113, 23 N. E. 519; *Jones v. Williams,* 153 Ky. 822, 156 S. W. 876; *Demaree v. Scates,* 50 Kas. 275, 32 Pac. 1123, 20 L. R. A. 97, 34 Am. St. 113; *State v. Murray,* 28 Wis. 96, 9 Am. Rep. 489.

Many state elections have been determined by a majority or plurality of fewer votes than that of the canvassed majority in the several precincts here involved. The choice of the national electoral college has been decided by a majority of but one vote. It is sufficient to cause every liberty-loving American citizen to shudder in contemplation of the possibility that the private "industrial necessity" of some industrial company or corporation, employing large numbers of men, may thus determine the policies, or the fate of the republic. The result of the present contest is but infinitesmal as compared with that to which it might lead. The force and power of judicial precedent is tremendous. It is highly probable that if the possibility so foreshadowed shall ever ripen into a reality, it will be because some court without vision of such fearful consequence, shall erroneously condone so grave an assault upon our liberties, as here appears. The links in the chains of tyranny are usually forged, singly and silently, and sometimes unconsciously, by those who are destined to wear them.

For the foregoing reasons the judgment of the court in each case before us, is reversed, and the entire poll in the said precincts of Niggerhead, Ravenwood, Walsen Mine, Oakview, Pryor, Rouse and Cameron, is annulled, and held for naught, and the election in each of said precincts is hereby set aside. This leaves a substantial and unquestioned majority for each of the contestors in the county, and which entitles each contestor to be declared elected to the office for which he was a candidate.

We find further, that J. B. Farr, the defendant in error, was not and is not the duly elected sheriff of Huerfano county, and that E. L. Neelley, the plaintiff in error, was and is the duly elected sheriff of said county. It is therefore ordered that the said J. B. Farr forthwith vacate the office of sheriff of said county and that the said E. L. Neelley, immediately and upon qualification as required by law, enter upon

and discharge the duties of said office of sheriff of Huerfano county.

We find further, that W. H. Freeland, the defendant in error, was not and is not the duly elected County Clerk and Recorder of Huerfano county, and that J. G. Archuleta, the plaintiff in error, was and is the duly elected County Clerk and Recorder of said county. It is therefore ordered that the said W. H. Freeland vacate the office of County Clerk and Recorder of said county and that the said J. G. Archuleta, immediately and upon qualification as required by law, enter upon and discharge the duties of said office of County Clerk and Recorder of Huerfano County.

We further find, that Jose S. Sanchez, the defendant in error, was not and is not, the duly elected County Assessor of said Huerfano county, and that Charles H. Sanchez, the plaintiff in error, was and is the duly elected County Assessor of said county. It is therefore ordered that the said Jose S. Sanchez vacate the office of County Assessor of said county and that the said Charles H. Sanchez, immediately and upon qualification as required by law, enter upon and discharge the duties of said office of County Assessor of Huerfano County.

We further find the Antonio D. Valdez, the defendant in error, was not and is not the duly elected County Commissioner of Huerfano county, and that Robert Young was and is the duly elected County Commissioner of said county. It is therefore ordered that the said Antonio D. Valdez vacate the office of County Commissioner of said county and that the said Robert Young, immediately upon qualification as required by law, enter upon and discharge the duties of said office of County Commissioner of Huerfano County.

Decision *en banc*.

Mr. Justice WHITE, Mr. Justice HILL and Mr. Justice TELLER concur.

Chief Justice GABBERT and Mr. Justice GARRIGUES dissent.

Mr. Justice BAILEY, unable to be present at the oral argument of the case, does not participate in the decision.

Mr. Justice WHITE specially concurring.

The record is pregnant with error which necessitates a reversal of the judgment, and the only serious question for determination is, whether, under the law and the evidence in the record, we should here enter findings and judgment for the contestors declaring them elected to the respective offices involved. After careful consideration of the matter, I am convinced that such findings and judgment should be entered.

The undisputed facts establish, beyond peradventure of doubt, that the conditions which prevailed in the so-called "closed precincts" preceding and on the day of election, were incompatiable with the free and open election that article II, section 5, of the Constitution requires, and, therefore, no valid election occurred therein. This follows without regard to the cause of the closure of the precincts, or whether there was physical intimidation and coercion of voters therein. If electors are deterred from the exercise of their free will by means of any influence whatever, although there be neither violence nor physical coercion, it is not the free exercise of the right of suffrage and comes clearly within the inhibition of the Constitution. *Littlejohn v. People,* 52 Colo. 217, 223, 121 Pac. 159, Ann. Cas. 1913D. 610. Neither threats, force nor actual bodily hurt or restraint is essential to make out a case of intimidation of the voter. The constitutional provision and the spirit of our institutions demand that the mind of the electors shall be free to exercise the elective franchise as the individual voters may see fit. *People v. Hoffman,* 116 Ill. 587, 599, 5 N. E. 596, 8 N. E. 788, 56 Am. Rep. 793. Indeed, there can be no free exercise

.of the elective franchise unless there be freedom of opinion, which is the basic principle of republican institutions. To insure freedom of opinion it is embodied in the organic law of our nation and state that the right of free speech and free discussion shall ever be inviolate. "The evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." Cooley's Constitutional Limitations, (7 ed.), 604.

"No one can doubt the importance, in a free government, of a right to canvass the acts of public men and the tendency of public measures, to censure the conduct of rulers, and to scrutinize closely the policy and plans of the government. This is the great security of a free government. If we would preserve it, public opinion must be enlightened; political vigilance must be inculcated; free, but not licentious discussion, must be encouraged." Story on the Constitution, Vol. 2, 642. Indeed, it is axiomatical there can be no freedom of opinion where the exchange of ideas is interdicted; where the dissemination of intelligence is forbidden; where men's political convictions are scrutinized by private authorities; where candidates of a political party are prevented from making an appeal to the judgment, reason, intelligence and patriotism of the electors. In fact, there can be no free suffrage where there is no free opinion, and there can be no free opinion where opinion is censored. The history of civilization, the evolution of free government forcibly illustrates the fatal influence of political censorship upon free institutions. The two cannot co-exist. This the framers of our Constitution recognized and appreciated, and and accordingly tied the hands of government itself. Indeed, the education and persuasion of voters is essential to popular. government; and there can be no free and open

election, within the meaning of our Constitution, in precincts that are closed to the public generally, and only those admitted thereto who meet the favor of the proprietor of the land exercising absolute dominion over the same. As said by Elihu Root, in his great work, "The Citizen's Part in Government," on page 54: "The great work of popular government is done in the associations and primaries and caucuses and conventions, in the conferences and discussions and canvassing, and personal association, in the private meetings and public meetings, in the convention committees, in the drafting of platforms, in the struggles. between candidates for nomination, in the efforts to educate, and convince, and pursuade voters, and in all the great and complicated process which goes on incessantly within each party in every village and town, and city, and .state, culminating in the submission of the work of the national convention to the voters of the country at large, and, upon one side or the other, determining the legislative and exe- cutive policies of the country."

Applying the fundamental principles above stated to the facts of this case, forces the conclusion reached herein. The "closed precincts" were so established as to be coincident in area with the private camps of the coal companies and the entire territory thereof was exclusively owned and controlled by them. Such precincts were not accessible to the public generally; no one could enter therein without the permission of the officials of the coal companies thru their guards or directly; the political supporters of plaintiffs in error, and persons who at the time professed allegiance to the political organization of which they were the nominees, were denied admission to the "closed precincts," while the defendants in error had free access thereto, by permission of the proprietors of the land. In fact, in many instances those supporting the plaintiffs in error, seeking admission to the "closed precincts," were expressly directed by the

guards to apply to Jeff Farr, one of the defendants in error, for permission to enter. In fact, defendants in error admit that the precincts were not open to the public generally, but claim that, upon request, any of the public, except "agitators," were admitted, and that plaintiffs in error did not seek to enter. In relation to this, however, it must be borne in mind that guards or officials of the company in which the "closed precincts" were situate were the sole judges of who was or was not an "agitator." Thus we have witness Weitzel stating that his company assumed to pass upon the question of whether a person applying for admission came there for legitimate purposes or for the purpose of agitation, and, further, that Mr. Mitchell, the chairman of the democratic party, would be denied admission "because he was connected with the strike agitators," and that Mr. Neelley, the democratic candidate for sheriff and a plaintiff in error herein, "would be considered an objectionable character." The conditions existing in the "closed precincts" is illustrated by the following: the record shows that Albert Clayton Hill, who had resided in Walsenburg for approximately nine years, and was engaged in the garage and plumbing business, was sent on election day, by the chairman of the democratic organization, to Walsen precinct to deliver a message to the watchers on behalf of that party, and also their lunch, and was refused admittance by the guard, George McBey, and his assistant. Hill's undisputed testimony on this point is as follows: "Q. What did they (the guards) say to you about getting in? A. They said I had to see Jeff Farr and get a pass, and I asked them what I had to see Jeff Farr for, if I could not get a pass from the superintendent, and they said: 'No, from Jeff.' I told them I understood that the superintendent was the man to get a pass from, that I knew quite a number of others that had gotten passes from the superintendent, and they said: 'You have to see Jeff to get a pass.' I asked them what Jeff had

to do with getting passes from a Colorado Fuel and Iron Company coal camp, and they said: 'That is his business and not yours.' "

It is clearly evident, in fact, conceded by defendants in error that anyone, who, in the opinion of the coal companies was either a member of or actively sympathizing with labor organizations, was an "agitator"; and they charge that "there was but one issue in the campaign, the strike;" and allege in their pleading that the democratic organization and its candidates were in active alliance and co-operation with those in charge of, and conducting that strike. Without regard to the truth of such allegation and contention, it clearly demonstrates that in the opinion of defendants in error any persons belonging to the organization that had nominated and were seeking to elect plaintiffs in error, were "agitators," and, therefore, under no circumstances would be admitted to the "closed precincts." Charging that the strike was the sole issue between the contending political organizations in the county, and that the democratic organization espoused the cause of the strikers, and the republican organization the cause of the owners, and conceding, as they do, that the owners of the land would not permit, as testified to by Mr. Weitzel, any person to come into the camps, (the "closed precincts") with a view to discussing the other side of the case, it is essentially an admission that representatives of the local Democratic organization and its candidates were excluded therefrom. Moreover, the discrimination practiced against the candidates and members of such political organization is further accentuated by the testimony of certain witnesses of defendants in error to the effect that they, tho Democrats, were admitted to the "closed precincts," for in every such instance such witnesses admitted that they were at the time not supporting the local ticket of their party, but the opposition ticket.

But, apart from this, the controlling fact is that the

"closed precincts" were non-public in character. They were so arranged that the judges and clerks charged with the conduct of the election were employes of the private interests exercising absolute dominion over the land, and who, of necessity, must perform their official duties, and the electors exercise their rights of suffrage, in the immediate presence of their employers. A party to a political campaign may not segregate large numbers of electors, enough to decide an election, and say in substantial effect that they must not be talked to about political matters; that nothing must be said in their presence, within the voting precinct, which might re-act against the political interests of the party asserting that extraordinary prerogative, and then say such election was valid, free from intimidation and improper influence. There can be no free and open election in precincts where the legitimate activity of a political organization is interfered with and its members excluded ether by private interests or public agencies, or by the co-operation of both. So, here, a private, extrinsic agency, assisted by a public agency—the board of county commissioners—obtruded itself between a political organization, and the electorate, and excluded one side to the controversy from the public territorial entity wherein the right of suffrage must be exercised. Moreover, that private agency was the industrial employer of that portion of the electorate from which such political organization was excluded, and was actively interested in the election of the nominees of the opposition political organization, to which organization also belonged the members of the public agency that had created the precincts in such manner that that which was subsequently done by the private agencies in that behalf was easy of accomplishment. While witnesses testified that it was common knowledge in the camps that whosoever of the employes of such private interests, voted for the list of nominees of the political organization so excluded from the "closed precincts," would

lose his job and be compelled to get out of the camps, there was testimony to the contrary. It is undisputed, however, that certain of such voters testified that they voted the Republican ticket because they knew they would lose their jobs if they did not do so, and immediately after the election certain employes who had voted the Democratic ticket left the camp, some witnesses testifying that they had been discharged, while agents of the employers testified that they had been discharged for incompetency, or had left of their own volition. Under such conditions there can be no doubt of the intimidation of the electorate. It is evident to all that there could have been no free election in the "closed precincts" if the names of the plaintiffs in error were kept off the official ballot because of the intervention of either private or public agencies; and there can be no difference in principle between such case and the case at bar, where private agencies prevented such nominees, the plaintiffs in error, from attempting to enlist the support of the voters in their behalf, and entrusted to a candidate of an opposition party the authority to exclude or admit whomsoever he pleased to the precincts, extending this even to election day. The owners of the camps unquestionably had the right to protect their property, and, under certain circumstances, to exclude the public therefrom, but when voting precincts and polling places were established upon such land, it thereupon became something more than private property over which private interests had absolute control. A public interest was thereby impressed upon it, entitling any elector to free and undisputed access thereto. If the private interests owning the land, whereon the precincts were established, required the same to be closed to the public, it is equally certain that the public interest imperatively demanded that there be undisputed access to such precincts and polling places, and the private interests must necessarily be subordinated to the public interest. But, apart from this, the

claim that the closure of the camps at the time of the creation of the precincts, the registration of qualified electors therein, and the election, was essential for protection against the attacks and violence of striking miners, is not borne out by the testimony. If such conditions existed at one time they had ceased to exist for some considerable time prior to the establishment of the precincts, the registration of voters and the election. During such entire time Federal troops were in command of the situation and had restored and maintained normal conditions. Indeed, it is admitted on all sides that such troops maintained the peace, preserved the order, and quelled all threatened disturbances. In the language of Mr. Weitzel: "The saloons were all closed for several months, and, speaking generally, the conditions were good, were peaceable, caused by the presence of the soldiers. There was no fear on the part of the company at the time the Federal soldiers were here, except fear of agitation." Fear of agitation is not a sufficient reason to justify acts producing conditions that make a farce of free government, and the right of the majority to rule therein.

Chief Justice GABBERT dissenting.

It should be noted that by the majority opinion it is not claimed that a single illegal vote was cast in the precincts named which would have changed the result of the election in Huerfano County, nor a single legal vote offered and refused, and that the conclusion announced is based solely upon the proposition that the returns in these precincts should be disregarded because a free and open election was impossible therein, in that the returns do not represent the free and untrammeled will of the voters of such precincts, and the vote therein was brought about by intimidation and coercion practiced by the officials of the coal companies. To support this is is said that by action of the County Commissioners each of the precincts involved, with one excep-

tion, was coextensive with the private grounds, under the private control of a coal corporation, which assumed to determine who should and who should not enter such precincts; that all persons residing therein, with the exception noted, were employes of the coal companies; that every election official in the precincts was an employee of such corporation; that the polling places were upon the grounds and in the buildings of these corporations; that the registration lists were kept in the private offices or buildings of these corporations and used or treated as their private property.

With respect to the act of the County Commissioners establishing boundaries of the several precincts named, it is sufficient to state that the power to establish voting precincts and the polling places is vested exclusively in that body, and the only question necessary to consider is whether any act of the coal companies upon which it is assumed to declare that the election returns in the several precincts involved should be disregarded, which results in disfranchising several hundred voters, the legality of whose votes is not questioned, prevented a free and open election in such precincts.

It is true, as stated in the majority opinion, there had been a strike which had been inaugurated by former employes of the coal companies, which at the time the precincts were established had not been settled, and that this strike had engendered a bitter feeling between the companies and the strikers. What was the result of this situation? The coal companies had engaged persons to take the place of those who had left their employ on account of the strike, who were being terrorized by letters threatening them with death if they continued to work, and were assaulted if they left the mines, and in order to protect these employes from violence and intimidation at the hands of those engaged in the strike, and to prevent destruction of their property, an area about some of the mines was enclosed with fences,

within which the workings were included, and the employes housed, and about others lines were drawn and armed guards stationed. Clearly no one can rightfully complain that any wrong was committed by the coal companies in taking precautions to protect their property and prevent their employes from being intimidated or assaulted, even to the extent of employing armed guards, which, however, was not done after May, 1914, two months before the precincts in question were established.

But it is said the public were excluded from the precincts. The testimony wholly fails to support this assertion. The strike had been in existence for a very considerable period prior to July, 1914. Many persons had been killed or assaulted. Property of the mining companies had been destroyed. The state had endeavored to stop this lawless action and restore peace through the medium of the National Guard. The conditions were so acute that the general government had placed several troops of the United States Cavalry in the vicinity to restore order. This action had aided materially in relieving the situation, but a large body of the so-called strikers still remained in the county, in segregated camps, engaged in intimidating those employed at the mines who had taken their places. Their action was not open but was attempted to be carried on through persons who would gain access to the camps under the pretense of delivering or selling goods, and other pretexts, and then incite fear by telling women and employes that the camp which they had entered was to be attacked, and they would be murdered if they remained. It was this class who were excluded, and from the evidence, even confining it to that introduced by the contestors, it is plain that anybody could enter each camp for any purpose whose mission was not one of intimidation. What was wrong about this action of the coal companies? How could the exclusion of the class mentioned affect the validity of an election? It certainly can-

not be claimed that such persons were entitled to intimidate employes or interfere with the industrial peace, which in a measure had been restored, upon the theory that their mission was lawful and therefore their exclusion was unlawful.

It is also said that political workers of the party of which the contestors were the nominees, as well as the contestors, were excluded from the several precincts involved, and that they were denied the opportunity of examining the registration lists in these precincts. With the utmost deference to my associates who concur in the majority opinion, it is respectfully submitted that the testimony wholly fails to justify the conclusion announced on these subjects. No one who claimed to represent the party of which contestors were the nominees was prevented from visiting the camps, and talking with employes on political questions. The registration lists were open to every one who desired to inspect them. They were copied by representatives of the contestors, and not a single contestor was excluded from the camps. There was some testimony on their part to the effect that they did not believe they would be permitted to enter the camps and hold political meetings, but this does not establish that they were excluded. A candidate who makes no effort to visit a precinct cannot have the vote of such precinct set aside on the mere allegation that he was excluded by his opponents, or that the voters refused to hear him speak, or that someone told voters not to attend his meetings.

The next question to consider is the statement that all the election officials in the precincts mentioned were employees of the coal companies. Some were, others were not. But these officials, to the extent the law requires; were selected by the party of which contestors were the candidates, and it does not appear that this party did not have its full quota of judges, clerks, watchers and challengers, or that any such officials were guilty of fraud in the conduct of the

election. It is also said that in numerous instances election judges assisted voters who were unable to speak or read the English language to mark their ballots. There is testimony that in a few instances this was done through ignorance of the law on the subject, not with any intention to coerce such voters. But discarding all ballots so marked, the result of the election would not be changed. It appears that a card was prepared and distributed, which contained the letter "R" and when placed on the ballot the letter would be opposite R in the word Republican, the purpose of which was to enable voters not familiar with the English language to mark their ballots for contestees, who were candidates of the Republican party. This card, so far as disclosed by the testimony, was used by one voter. In brief, the facts as established by the testimony are that neither the public, contestors, nor their political workers were excluded from the camps; that the party of which contestors were candidates was not prevented from holding meetings for the purpose of discussing political questions; that the only persons who were not permitted to enter the camps were those whose mission was in no sense political; that the contestors had their full quota of election officials; that no one was prevented from examining and copying the registration lists, and that the election was quiet and orderly in every respect. It is upon these facts that the majority opinion concludes the returns do not represent the free will of the voters, in that it must be implied they were intimidated and coerced by the officials of the coal companies because the boundaries of the precincts, with one exception, are co-extensive with the respective coal camps. When the conditions are properly understood it is manifest that this conclusion can not be justified for that reason. The local issue between the two parties in Huerfano County was the strike. The employes of the coal companies believed that the contestors supported the strikers. Whether this belief was warranted

is not material. The men in what is designated the closed camps entertained that opinion. They believed that if the contestees were elected they would be protected from intimidation and assult by those whose places they had taken. Entertaining these beliefs, for whom would they vote? Without question, for the contestees. How then can it be said that the voters in the precincts involved were coerced or intimidated in the absence of a scintilla of testimony that a single voter was influenced in marking his ballot by any act of an election official or an official of a coal company? Counsel for contestors frankly admit that the only evidence which tends to establish their cause is purely circumstantial, because it is consistent with a general system of coercion and intimidation, but this is of no weight when it conclusively appears that the voters registered their choice of candidates consistent with their beliefs, and in harmony with what they believed was for their best interests. If they were intimidated or coerced some of them could have been found to come forward and swear to that fact. The judicial power in an election contest to discard the entire returns from precincts can only be exercised when it is clearly established that frauds subversive of the purity of the ballot-box and tending to nullify the popular will have been perpetrated by election officials, or that the voters have been intimidated or coerced, and the extent of such frauds or intimidation and coercion cannot be disclosed with reasonable certainty.

The burden of proof to establish facts which would invalidate the returns under consideration was upon the contestors. They have wholly failed to sustain this burden. There was no conspiracy as charged. A conspiracy is a combination of persons to accomplish by concerted action a criminal or unlawful purpose, or to accomplish a purpose not in itself criminal or unlawful by criminal or unlawful means. Every act upon which it is assumed to disregard

the returns was for the purpose of protecting employes in the precincts involved from violence and intimidation. It is plain from the testimony that this course was necessary. It is clear that no one took advantage of the situation brought about by the conditions in Huerfano County to prevent an open, free and fair election, or to intimidate or coerce any voter, and the final analysis of the case discloses that the only basis for a contest is that by protecting the employes of the coal companies from assault and intimidation thereby persons who desired to commit such unlawful acts were prevented from doing so.

The writer is authorized to state that Mr. Justice GARRIGUES concurs in this opinion.

Decided June 21, A. D. 1916. Rehearing denied July 3, A. D. 1916.